1
2
3
4
5
6
7
8                              UNITED STATES DISTRICT COURT

9                            SOUTHERN DISTRICT OF CALIFORNIA

10

11   GEN-PROBE INCORPORATED,                      Case No. 09-CV-2319 BEN (NLS)

12            Plaintiff and Counterdefendant,     **JOINT MOTION FOR DETERMINATION OF**
                                                  **TERMS IN THE PROTECTIVE ORDER**
13            v.

14   BECTON, DICKINSON AND COMPANY,

15            Defendant and Counterclaimant.

16   ─────────────────────────────────────
     AND RELATED COUNTERCLAIMS
17

18
19
20
21
22
23
24
25
26
27
28

Pursuant to the Case Management Order and Order Setting Deadlines Regarding Joint Proposed Protective Order, issued by Magistrate Judge Nita L. Stormes on March 1, 2010, Plaintiff Gen-Probe, Inc. ("Gen-Probe") and Defendant Becton, Dickinson and Company ("BD"), hereby move the Court to enter a protective order in this case.  The parties have agreed on a number of terms for a protective order, but have not been able to reach agreement as to two key issues, namely:  (1) what restrictions are appropriate for the designation of information as "Highly Confidential" under the Protective Order; and (2) whether there should be a prosecution bar applied to individuals who have access.

The parties present their positions and arguments on these issues below, and have submitted their respective proposed Protective Orders herewith.

I.    **ISSUE #1: RESTRICTIONS ON INFORMATION THAT MAY BE DESIGNATED "HIGHLY CONFIDENTIAL" UNDER THE PROTECTIVE ORDER**

A.    **Gen-Probe's Proposal For The Definition Of "HIGHLY CONFIDENTIAL" Information:**

Designation as "HIGHLY CONFIDENTIAL":  Any producing party may designate information as "HIGHLY CONFIDENTIAL" only if, in the good faith belief of such party and its outside counsel, disclosure of the information to another party is likely to cause competitive harm to the disclosing party, and embodies, contains or reflects:

(a) confidential commercial contracts and licenses with a third party, including documents relating thereto;

(b) highly sensitive plans for future marketing or future commercialization;

(c) highly sensitive financial or competitive information;

(d) trade secret information reflecting nucleic acid sequence or chemistry information, source code, or manufacturing procedures; or

(e) other trade secret or other confidential information that concerns any product design, research, development, testing, manufacturing or other product information.

# Gen-Probe's Argument[1]

1.      BD Proposes An Arbitrary Date Of January 1, 2002, Prior To Which No Information Can Be Designated "Highly Confidential"

The definition of "HIGHLY CONFIDENTIAL" Information will be provided in paragraph 4 of the Protective Order. The parties' proposed definitions differ in one marked respect: BD has selected an arbitrary date – January 1, 2002 – and proposes that the Court conclusively determine that any documents or information created before that date cannot be "Highly Confidential." Under BD's proposal, all documents and information created prior to January 1, 2002 can, at most, be designated "Confidential." This is important, because any information that is designated "Confidential," rather than "Highly Confidential," can be examined by up to five BD employees – whether or not those BD employees are engaged in "competitive decision-making." *See* Gen-Probe's Proposed Protective Order (sent under separate cover to the Court), ¶ 10; *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992).

Thus, were the Court to adopt BD's proposal, BD's competitive decision makers could review any Gen-Probe document created before January 1, 2002 – even if the document contains Gen-Probe's highly sensitive trade secret, financial, and/or other competitive information. Those trade secrets which may be implicated by BD's future discovery requests include, but are not limited to, information regarding the nucleotide sequences and chemistries of the probes used in Gen-Probe's molecular diagnostic tests, Gen-Probe's molecular diagnostic instrumentation development strategies and formats, its manufacturing procedures, and its instrumentation source code. (Kacian Decl., ¶¶ 5, 8-9.)[2] The sensitive nature of this information, even information

---

[1] In support of its positions and arguments, Gen-Probe also submits the declarations of Daniel L. Kacian, Ph.D., M.D. ("Kacian Decl."), Gen-Probe's Executive Vice President and Chief Scientist, and Stephen P. Swinton ("Swinton Decl."), along with accompanying Exhibits A through D.

[2] Moreover, because BD has not yet served any document requests, and because the case is in its early stages, it is impossible to predict all the categories of Gen-Probe's most competitively sensitive confidential information that may be subject to discovery or to confirm that that information will not be disclosed in documents dated prior to BD's arbitrary cut-off of January 1, 2002.

CASE NO. 09-CV-2319 BEN (NLS)

1  dating back over a decade, does not go "stale," but rather is relevant to Gen-Probe's ongoing

2  research, development and manufacturing activities.  (*Id.*)

3        Gen-Probe relies heavily on intellectual property protection and enforcement practices to

4  maintain its competitive position in the molecular diagnostics market.  The company spends

5  more than 20 percent of its revenues on research and development.  This focus on research has

6  resulted in the issuance of more than 500 U.S. and foreign patents.  If Gen-Probe's most highly

7  sensitive confidential materials were to be shown to BD's employees or otherwise to persons

8  involved in prosecuting patent applications in the molecular diagnostics field for Gen-Probe's

9  competitors, Gen-Probe would be placed at substantial risk of irreparable competitive harm.

10  (Kacian Decl., ¶¶ 4-6.)

11        BD is a much larger entity than Gen-Probe; BD's revenues in 2009 were over 14 times

12  greater than Gen-Probe's.  (*Id.* ¶ 6.)  BD has significantly more resources to bring to bear in its

13  research, development and intellectual property procurement efforts.   Among other things,

14  allowing BD's in-house personnel to view Gen-Probe's most highly guarded technical trade

15  secrets and financial information, including third party licenses and other contracts, likely would

16  affect BD's own technical and business strategies in ways that would undermine Gen-Probe's

17  competitive position in the marketplace.  In addition, Gen-Probe's patent position would be

18  severely jeopardized by anyone allowed access to Gen-Probe's most sensitive technical materials

19  who is actively prosecuting patent applications in the same technical field of molecular

20  diagnostic tests and instruments in which Gen-Probe operates.  (*Id.* ¶ 8.)

21        BD's strict cutoff date proposal, moreover, makes no logical sense.  The contents of a

22  document, rather than its date, determine whether it would cause competitive harm if disclosed to

23  BD's employees.  There is no reason to assume – much less conclusively presume – that all

24  Gen-Probe information created prior to January 1, 2002 has lost its sensitive nature such that it

25  can be disclosed to BD's employees without causing competitive harm to Gen-Probe.  Moreover,

26  it would unfairly prejudice Gen-Probe, as Gen-Probe is the innovator of the technology at issue

27  in this case and BD is trying to play catch-up.  BD appears to want to create an asymmetrical and

28

CASE NO. 09-CV-2319 BEN (NLS)

1  unjust situation, where the innovator's early-developed trade secrets and competitive information

2  get disclosed to the late-entrant infringer.

3       Finally, it should be noted that BD has entered into protective orders in other patent cases

4  which do not include the type of "conclusive presumption" provision that BD is advocating in

5  this case.  (Swinton Decl., ¶¶ 12-14; Exh. D.)  Indeed, Gen-Probe's counsel have not found a

6  single protective order to which BD is a party that contains such a provision.  (*Id*., ¶ 14.)

7          2.     BD's Proposal Would Result In The Dissemination Of
   Gen-Probe's Highly Sensitive And Competitive

8                    Information to BD's Competitive Decision Makers

9       BD's proposed "conclusive presumption," if adopted, would result in BD's competitive

10  decision-makers, including its in-house attorneys responsible for patent prosecution *in the same*

11  *technological fields as those at issue in this case*, obtaining Gen-Probe's highly sensitive trade

12  secret and competitive information, disclosed in documents dated prior to January 1, 2002.  This

13  is improper and would unfairly prejudice Gen-Probe.

14       During the parties' meet-and-confer process, BD identified two of the five employees

15  that it intends to designate to review Gen-Probe's "Confidential" information.  (Swinton Decl.

16  ¶¶ 3, 6.)  Both are highly placed in-house counsel at BD.  Although Gen-Probe asked for

17  descriptions of those attorneys' duties and responsibilities, BD did not provide any.  Nonetheless,

18  it is clear that both are involved in the prosecution of BD's patents in the same technological

19  fields as those in this case.

20       This Court has held that a company's *outside counsel* involved in patent prosecution are

21  "competitive decision-makers" who should be barred from accessing the opposing party's

22  confidential information.  *Presidio Components, Inc. v. American Tech. Ceramics Corp.*, 546 F.

23  Supp. 2d 951, 955-59 (S.D. Cal. 2008).  That conclusion is even more compelling when the

24  designated recipients are *in-house counsel* involved in patent prosecution.

25       Numerous district courts have recognized that, regardless of their ethics and good faith

26  efforts, it is not realistic to expect competitive decision-makers to be able to compartmentalize a

27  competitor's information received in discovery.  *Motorola, Inc. v. Interdigital Technology Corp.*,

28  Case No. Civ. A. 93-488 LON, 1994 U.S. Dist. LEXIS 20714, at *14, 1994 WL 16189689 at *5

4

1   (D. Del. Dec. 19, 1994) ("'Inadvertence, like the thief-in-the-night, is no respecter of its victims.

2   Inadvertent or accidental disclosure may or may not be predictable.  To the extent that it may be

3   predicted, and cannot be adequately forestalled in the design of a protective order, it may be a

4   factor in the access decision.'"  "The level of introspection that would be required [to separate

5   out what was learned from a competitor during a lawsuit] is simply too much to expect, no

6   matter how intelligent, dedicated, or ethical the . . . attorneys may be.") (quoting *U.S. Steel Corp.*

7   *v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984).  *See also Safe Flight Instrument Corp. v.*

8   *Sundstrand Data Control, Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988) ("we rule that [plaintiff's

9   president] should be precluded from reviewing defendant's confidential materials.   First,

10   accepting that [plaintiff's president] is a man of great moral fiber, we nonetheless question his

11   human ability during future years of research to separate the applications he has extrapolated

12   from [defendant's] documents from those he develops from his own ideas.");.  *See generally*

13   *Presidio Components*, 546 F. Supp. 2d at 955-56 (citing cases).

14                                    a.      David Highet

15           BD identified David Highet, its in-house Vice President and Chief Intellectual Property

16   Counsel, as one of the five employees it intends to designate to review Gen-Probe's

17   "Confidential" information.  (Swinton Decl. ¶ 3.)  BD did not respond to Gen-Probe's request for

18   a summary of Mr. Highet's duties and responsibilities.  (*Id.*)  Despite BD's failure to provide this

19   information, it is clear that Mr. Highet is deeply involved in the prosecution of BD's patent

20   applications.    He is listed as counsel of record on two BD patent applications

21   (U.S. 2008/0251489 and 2008/0251490) that are directed to penetrable caps used with specimen

22   containers – the same subject matter covered by Gen-Probe's U.S. Patent Nos. 6,893,612 and

23   7,294,308 asserted in this case.  (Swinton Decl. ¶ 4; Exhs. A, B.)  A search of the PTO website

24   further reveals that Mr. Highet is also listed as BD's legal representative on 77 issued BD Patents

25   and over 300 published (and pending) applications.  (*Id.* ¶ 5.)

26           In *Presidio Components*, this Court carefully analyzed and applied the applicable law

27   concerning whether in-house counsel should be permitted to access an opponent's confidential

28   information.  The Court stated:

> When evaluating the risk of inadvertent disclosure of Presidio's confidential information to [ATC's in-house] counsel, the Court must examine the factual circumstances of [ATC's in-house counsel's] relationship to ATC.  The key inquiry is whether [in-house counsel] is "involved in 'competitive decision-making'; that is, advising on decisions about pricing or design 'made in light of similar or corresponding information about a competitor.'"

546 F. Supp. 2d at 953 (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)).   The Court further noted that "[i]f the in-house counsel is involved in 'competitive decision-making,' 'the risk of disclosure may outweigh the need for confidential information.'"  546 F. Supp. 2d at 953 (quoting *Intel Corp. v. VIA Tech., Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000)).

In *Presidio Components*, the in-house counsel was not involved in patent prosecution. 546 F. Supp. 2d at 953.  Nonetheless, after reviewing his responsibilities, this Court found that he was involved in competitive decision-making and precluded him from receiving the opponent's confidential information.  *Id.* at 954.

In the instant case, the determination that Mr. Highet is involved in BD's competitive decision-making is far easier to make than the decision faced by this Court in *Presidio Components*.  As set forth above, Mr. Highet is deeply immersed in BD's patent prosecution activities, including those activities directed at technologies at issue in this case.  Accordingly, he must be precluded from receiving Gen-Probe's "Highly Confidential" materials – regardless of whether the materials were created prior to January 1, 2002.

There is, moreover, evidence that Mr. Highet has overseen BD's utilization, indeed plagiarism, of Gen-Probe's work product in the past.  In particular, the BD patent applications for which Mr. Highet is counsel of record contain paragraphs that were lifted almost *verbatim* from Gen-Probe's issued patents.  The Court can observe this for itself.  The left-hand column below contains the fourth paragraph of the "Background of the Invention" section of Gen-Probe's asserted Patent No. 6,893,612.   The right hand column contains the fourth paragraph of the same section in BD's U.S. application 2008/0251489:

| Gen-Probe '612 Patent | BD 2008/0251489 Patent Application |
|---|---|
|     Concerns with cross-contamination are especially acute when the assay being performed involves nucleic acid detection and includes an amplification procedure such as the well known polymerase chain reaction (PCR), or a transcription-based amplification system such as transcription-mediated amplification (TMA).  (A review of several amplification procedures currently in use, including PCR and TMA, is provided in HELEN H. LEE ET AL., NUCLEIC ACID AMPLIFICATION TECHNOLOGIES (1997).)  Since amplification is intended to enhance assay sensitivity by increasing the quantity of targeted nucleic acid sequences present in a specimen, transferring even a minute amount of pathogen-bearing specimen from one vessel, or target nucleic acid from a positive control sample, to another vessel containing an otherwise negative specimen could result in a false-positive result. |     Concerns with cross-contamination are especially acute when the assay being performed involves nucleic acid detection and an amplification procedure, such as the well known polymerase chain reaction (PCR) or a transcription based amplification system (TAS), such as transcription-mediated amplification (TMA) or strand displacement amplification (SDA).  Since amplification is intended to enhance assay sensitivity by increasing the quantity of targeted nucleic acid sequences present in a specimen, transferring even a minute amount of specimen from another container, or target nucleic acid from a positive control sample, to an otherwise negative specimen could result in a false-positive result. |

    Similarly, a comparison of the second paragraph of Gen-Probe's "Detailed Description" section of its patent with the third paragraph in the same section of BD's patent application shows the same type of plagiarism:

| Gen-Probe '612 Patent | BD 2008/0251489 Patent Application |
|---|---|
|     With reference to the figures, preferred caps 30A-E of the present invention are shown alone or in combination with a vessel 20 which can be used for receiving and storing fluid specimens for subsequent analysis, including analysis with nucleic acid-based assays or immunoassays diagnostic for a particular pathogenic organism.  When the desired specimen is a biological fluid, the specimen can be, for example, blood, urine, saliva, sputum, mucous or other bodily secretion, pus, amniotic fluid, cerebrospinal fluid or seminal fluid.  However, the present invention also contemplates materials other than these specific biological fluids, including, but not limited to, water, chemicals and assay reagents, as well as solid substances which can be dissolved in whole or in part in a fluid milieu (e.g., tissue specimens, stool, |     A pierceable cap of the present invention maybe combined with a vessel to receive and store sample specimens for subsequent analysis, including analysis with nucleic acid based assays or immunoassays diagnostic for a particular pathogenic organism.  When the sample specimen is a biological fluid, the sample specimen may be, for example, blood, urine, saliva, sputum, mucous or other bodily secretion, pus, amniotic fluid, cerebrospinal fluid or seminal fluid.  However, the present invention also contemplates materials other than these specific biological fluids, including, but not limited to, water, chemicals and assay reagents, as well as solid substances which can be dissolved in whole or in part in a fluid milieu (e.g., tissue specimens, tissue culture cells, stool, environmental samples, food products, |

7

| Gen-Probe '612 Patent | BD 2008/0251489 Patent Application |
|---|---|
| environmental samples, food products, powders, particles and granules). The vessel 20 is preferably capable of forming a substantially leak-proof seal with the cap 30A-E and can be of any shape or composition, provided the vessel is shaped to receive and retain the material of interest (e.g., fluid specimen or assay reagents). Where the vessel 20 contains a specimen to be assayed, it is important that the composition of the vessel be essentially inert so that it does not significantly interfere with the performance or results of an assay. A preferred vessel 20 is formed of polypropylene and has a generally cylindrical shape which measures approximately 13 mm. times 82 mm. | powders, particles and granules). Vessels used with the pierceable cap of the present invention are preferably capable of forming a substantially leak-proof seal with the pierceable cap and can be of any shape or composition, provided the vessel is shaped to receive and retain the material of interest (e.g., fluid specimen or assay reagents). Where the vessel contains a specimen to be assayed, it is important that the composition of the vessel be essentially inert so that it does not significantly interfere with the performance or results of an assay. |

The fact that BD, and Mr. Highet, would use the language of Gen-Probe patents as the framework for BD's subsequent patent applications evidences the dangers of BD's competitive decision-makers obtaining Gen-Probe's "Highly Confidential" information.

### b.    Allan Kiang

BD also stated its intention to designate Allan Kiang, its in-house Senior Intellectual Property Counsel, as a recipient of Gen-Probe's "Confidential" information.   As with Mr. Highet, BD did not respond to Gen-Probe's request for a summary of Mr. Kiang's duties and responsibilities.  (Swinton Decl., ¶ 6.)  That failure to respond prevents Gen-Probe and the Court from evaluating the full extent of Mr. Kiang's competitive decision-making activities for BD.

Despite BD's failure to provide this information, it is clear that Mr. Kiang also is heavily involved in the prosecution of BD's patent applications, including applications in the same technological fields that are at issue in this lawsuit.  Gen-Probe has determined that Mr. Kiang is listed as counsel of record on a BD patent application directed at its accused Viper instrument system.  (Swinton Decl., ¶ 7; Exh. C (U.S. Patent Pub. No. 2004/0029260).)  PTO records reveal that Mr. Kiang is also listed as legal representative on 17 issued BD patents.  (*Id.* ¶ 8.)  Thus, like Mr. Highet, Mr. Kiang is a competitive decision-maker who must be precluded from reviewing Gen-Probe's "Highly Confidential" Information.

c.    The Three Unnamed Remaining BD Employees

BD has not identified which three employees it intends to designate to complete its list of five in-house personnel authorized to access Gen-Probe's "Confidential" information. Accordingly, it is unknown to what extent those unnamed persons are competitive decision-makers for BD or the risk of "inadvertent disclosure" they would present to Gen-Probe's most highly sensitive competitive information, whether dated prior to January 1, 2002 or otherwise.

3.    There Is No Reason To Believe That Gen-Probe Will Improperly Designate Materials As "Highly Confidential"

Finally, there is no reason to assume that Gen-Probe will unjustifiably designate documents and information as "Highly Confidential."  Furthermore, BD complains that the definition is so broad that BD cannot imagine any relevant materials not falling within the definition.  BD's complaints are without merit.  Indeed, a substantial bulk of the information dated prior to January 2002 that is relevant to the case – the documents underlying the conception and reduction to practice of the patents-in-suit – will be produced later this week with no more than a "Confidential" designation.  Gen-Probe anticipates that this production will be in excess of 20,000 documents comprising over 130,000 pages, giving BD's in-house personnel plenty to review for their purposes in assisting BD's outside counsel with the case.  (Swinton Decl., ¶ 19.)  Moreover, if Gen-Probe were to make improper designations, the protective order would provide a straight-forward means for BD to meet and confer with Gen-Probe and then present the issue to the Court for resolution on the merits.  Gen-Probe Proposed Protective Order, ¶ 12.

4.    Conclusion

There is no logical basis for conclusively presuming that any Gen-Probe document or information created before January 1, 2002 does not contain highly sensitive trade secret, financial, or competitive information.  Not only is there no evidence supporting BD's novel argument that none of the Gen-Probe information created prior to January 1, 2002 can still be highly sensitive, but the Declaration of Dr. Daniel L. Kacian, Gen-Probe's Executive Vice President and Chief Scientist, provides affirmative evidence to the contrary.  BD's proposal

CASE NO. 09-CV-2319 BEN (NLS)

1   would prejudice Gen-Probe, as it would result in competitive decision-makers at BD receiving

2   and reviewing Gen-Probe's highly sensitive information.

3          The determination of whether a document should be designated "Highly Confidential"

4   should be made on a document-by-document basis, regardless of the date.  If BD disagrees with

5   the designation of a particular document, and the parties are unable to resolve their disagreement,

6   the issue can be presented to the Court.

7      **B.**      **BD's proposal for the definition of "HIGHLY CONFIDENTIAL"**
                    **information:**
8

9          Designation as "HIGHLY CONFIDENTIAL":   Any producing
           party may designate information as "HIGHLY CONFIDENTIAL"
10         only if, in the good faith belief of such party and its outside
           counsel, disclosure of the information to another party is likely to
11         cause competitive harm to the disclosing party, and embodies,
           contains or reflects:
12
           (a)      confidential commercial contracts and licenses with a third
13         party, including documents relating thereto;

14         (b)      highly sensitive plans for future marketing or future
           commercialization created after January 1, 2002;
15
           (c)      highly sensitive financial or competitive information
16         created after January 1, 2002;

17         (d)      trade secret information reflecting the nucleic acid
           sequence of molecular diagnostic probe products of the producing
18         party currently available or in development; or

19         (e)      other trade secret or other confidential information created
           after January 1, 2002 that concerns any product design, research,
20         development, testing, manufacturing or other product information.

21                              **BD's Argument**

22         BD's proposed definition of "Highly Confidential" seeks to balance the confidentiality

23   concerns of both parties with the need for client representatives to participate in the litigation,

24   evaluate claims, and formulate strategy.  Specifically, BD's proposal would preclude the parties

25   from applying the "Highly Confidential" classification (outside attorneys only)  to marketing

26   plans, market information, and product materials created more than eight years ago (prior to

27   January 1, 2002).  These older materials would still be protectable as "Confidential."  *See* BD's

28   Proposed Protective Order (sent under separate cover to the Court).

1    Contrary to Gen-Probe's assertions that BD's proposal is a "strict" cut-off, documents

2  concerning licensing agreements and proprietary nucleic acid sequences would be protectable as

3  "Highly Confidential" regardless of the date.  Indeed, during the meet and confer process, BD's

4  counsel expressed a willingness to discuss carving out specific categories of information from

5  the date cut-off, but Gen-Probe's counsel was unable to identify any specific categories of

6  concern other than nucleic acid sequences (a carve-out reflected in BD's proposal) and source

7  code (which the parties have agreed to address separately, if production of such code becomes

8  necessary).  Fiacco Decl. ¶15.  BD's proposal is consistent with the technological reality that

9  product, marketing, and competitive market information that is more than eight years old is not

10  likely to be of any competitive value to either party.  Such older information will, however, be

11  important to allow client representatives to assess claims concerning development activity that

12  occurred in the late 1990's and early 2000's.

13    Gen-Probe's proposal, by contrast, is so broad as to permit the parties to designate

14  virtually all materials produced in this case as "Highly Confidential."  In fact, Gen-Probe first

15  advocated for an order permitting precisely that result.  Fiacco Decl. ¶14.  Although Gen-Probe

16  has since agreed to a two-tiered protective order (permitting five client representatives to view

17  "Confidential" material), Gen-Probe's new definition of "Highly Confidential" swallows any

18  distinction between "Confidential" and "Highly Confidential" by including boundless categories

19  of information with the definition of "Highly Confidential."  For example, in addition to broad

20  categories of "chemistry information" or "manufacturing procedures," Gen-Probe also proposes

21  to include a catch-all category: "other trade secret or other confidential information that concerns

22  any product design, research, development, testing manufacturing or other product information."

23  It is hard to imagine any relevant materials not falling within Gen-Probe's broad definition,

24  including the "conception and reduction to practice" documents.[3]

25

26  [3] Although Gen-Probe has represented that it would produce the "vast majority" of the 130,000
    pages of documents underlying the conception and reduction to practice of the patents-in-suit
27  with no more than a "Confidential" designation, their proposed protective order's "catch-all"
    phrase would allow them to designate such materials as "Highly Confidential" information.  *See*
28  Swinton Decl.. ¶ 16.  Moreover, it is hardly clear what they mean by the "vast majority" of such
    a voluminous set of highly relevant documents.

CASE NO. 09-CV-2319 BEN (NLS)

Courts routinely reject protective orders that allow all materials to be designated "Highly Confidential."[4]  In that same spirit, this Court should not enter an order such as that proposed by Gen-Probe which in effect contains no standards, thereby allowing a party to have complete discretion over confidentiality designations.

For these reasons, the Court should adopt BD's proposed definition and permit client representatives to have access to marketing, competitive market, and product development information that was created prior to January 1, 2002, other than that specifically carved out in BD's proposed order.

II.   **ISSUE #2: WHETHER THE PROTECTIVE ORDER SHOULD INCLUDE A PROSECUTION BAR ON PERSONS HAVING ACCESS TO INFORMATION DESIGNATED "HIGHLY CONFIDENTIAL"**

A.   **Gen-Probe's Proposal For a Prosecution Bar:**

Gen-Probe proposes to insert the following paragraph as Paragraph 9 in the Protective Order, concerning the incorporation of a prosecution bar on persons having access to information designated "HIGHLY CONFIDENTIAL":

> Subject to the restrictions set forth in Paragraph 8 above, information designated "HIGHLY CONFIDENTIAL" may not be viewed by any person who is actively involved in, or materially assists others who are actively involved in prosecuting patents in the technology area of molecular diagnostic tests and molecular diagnostic instrument systems (hereinafter the "Technology Area"). To ensure compliance with this provision, the parties shall create an ethical wall between those persons with access to information designated "HIGHLY CONFIDENTIAL" under this Order and those individuals who prosecute or materially assist others who prosecute patents in the Technology Area. In addition, any individual otherwise qualified to view information designated "HIGHLY CONFIDENTIAL" under the terms of Paragraph 8 and this Paragraph shall be barred from prosecuting or materially assisting others involved in prosecuting patents in the Technology Area for a period of two (2) years following the final termination of this action, including any and all appeals.

---

[4] *See, e.g., Klayman v. Judicial Watch, Inc.*, 247 F.R.D. 19, 24 (D.D.C. 2007) (refusing to enter blanket "attorney's eyes only" order; stating "[d]istrict courts must be [ ] chary of issuing protective orders that restrict the ability of counsel and client to consult with one another during trial or during the preparation therefor.") (*citing Doe v. District of Columbia*, 697 F.2d 1115, 1119 (D.C. Cir. 1983)); *THK America, Inc. v. NSK Co. Ltd.*, 157 F.R.D. 637, 651 (N.D. Ill. 1993) (awarding attorney's fees to patent plaintiff for defendant's blanket designation of all discovery materials as "attorney's eyes only").

**Gen-Probe's Argument**

1.      During The Meet-And-Confer Process, BD Stated Its
        Intention To Have Its Patent Prosecution Counsel
        Participate In This Lawsuit But Refused To Provide Any
        Information As To Their Identities Or Involvement

BD is represented by two law firms, Foley Hoag LLP and Knobbe Martens Olson & Bear LLP.  During the meet-and-confer process, BD's counsel stated their intention to have BD's patent prosecution counsel at both firms participate in this lawsuit.  (Swinton Decl., ¶ 9.)  BD's lead counsel from Knobbe Martens, Mr. Zelkind, disclosed that attorneys at his firm *are in fact currently prosecuting patents for a BD subsidiary in the Technology Area*.  Mr. Zelkind, however, did not provide any details as to those individuals' identities or their involvement, if any, in this lawsuit.  (*Id.* ¶ 10.)  BD's lead counsel from Foley Hoag, Mr. Ware, refused to disclose how many of his colleagues at his firm were engaged in such activities, arguing that it was too cumbersome to do so.  (*Id.* ¶ 11.)

In its insert concerning this issue, presented to Gen-Probe's counsel at 1:12 p.m. today, BD presents a number of conclusory statements, unsupported by declaration or other evidence, to the effect that Foley Hoag's and Knobbe Martens' prosecution counsel are not "competitive decision-makers."[5]  BD does not identify the prosecuting attorneys whom it proposes to include on its litigation team, nor does it state what involvement – if any – they have had to date. Instead, BD essentially presents the Court with an ultimatum, boldly asserting that it has made a substantial investment in educating its attorneys and it will be prejudiced unless the Court allows all the attorneys to review Gen-Probe's "Highly Confidential" information.

It is unacceptable for BD to hide the ball and refuse to respond to inquiries during the meet-and-confer process (Swinton Decl., ¶¶ 9-11, 17-18), and then present the Court with unsupported factual assertions the day the joint motion is due.  Likewise, it is unacceptable for BD to refuse to cooperate in defining the subject matter of the patent prosecution bar (*id.* ¶ 17), only to complain to the Court that the scope of the subject matter of the bar is too broad.  If there

---

[5] Given the fact-intensive, and wholly unsupported, nature of BD's contentions, the Court may want to address the issues through a formal motion procedure and require the submission of signed declarations and the attendance of the declarants.

1   are particular prosecution counsel that BD wants to argue are indispensible to its case, it should

2   identify them and explain the bases for such an argument.   It should also explain what the

3   attorney's practice area is and why he or she should not be subject to a restriction on prosecuting

4   applications in the technological field as to which he or she will be obtaining Gen-Probe's

5   Highly Confidential information.

6        A patent prosecution bar should be implemented to prevent people accessing the other

7   party's "Highly Confidential" information from participating in the prosecution of patents in the

8   same technological fields for a period of two years after the termination of this lawsuit.   BD

9   previously has entered into protective orders barring litigation counsel from participating in

10   patent prosecution.  (Swinton Decl., ¶¶ 12-13; Exh. D.)  This provision would be applied to, and

11   affect, both parties evenly.  (Contrary to BD's implication, both Mr. Swinton and Mr. Long,

12   counsel to Gen-Probe, are admitted to practice before the PTO and would be subject to the same

13   prosecution bar.)  (*Id*. ¶ 18.)

14            2.      This Court, And Numerous Other Courts, Have Concluded
                     That Patent Prosecution Bars Should Be Imposed On
15                   Outside Counsel

16        In *Presidio Components*, this Court stated:  "When deciding whether one side's patent

17   prosecutor should have access to the opposing party's confidential information, courts must

18   balance the 'one party's right to broad discovery and the other party's ability to protect its

19   confidential materials from misuse by competitors.'"  546 F. Supp. 2d at 955 (citation omitted).

20   The Court noted that myriad courts "have barred counsel from accessing the opposing party's

21   confidential information where the counsel was involved in patent prosecution."  546 F. Supp. 2d

22   at 955-56 & n.2 (citing cases).   The Court considered and rejected the argument that a party's

23   patent prosecution counsel could effectively separate in his mind the opposing party's

24   confidential information obtained during litigation from the strategic decision-making that is

25   required to draft and prosecute patent claims.  *Id*. at 956-59.  It held that "the patent prosecutors

26   for any party should make a choice:  either prosecute future patents . . . or litigate the patent at

27   issue, but not both."  *Id*. at 958.  Of relevance here, in light of BD's attempt to distinguish

28

CASE NO. 09-CV-2319 BEN (NLS)

1   between prosecution counsel for the plaintiff versus counsel for the defendant, the Court's order

2   applied to "patent prosecutors for *any* party" (emphasis added).

3          The same considerations that led to the Court's decision in *Presidio Components* apply to

4   this case.   Giving BD's prosecution counsel access to Gen-Probe's "Highly Confidential"

5   information would create the very real danger that those counsel would use the information,

6   inadvertently or deliberately, to pursue new and modified patent claims within the Technology

7   Area – claims that would disclose and/or cover Gen-Probe's trade secrets.   *See id.* at 958-59

8   ("[b]y prosecuting patents for Presidio, Humphrey would have had to make decisions involving

9   scope and emphasis, such as drafting new claims to read on new products and new directions

10  'where [a party] projects sales to be more critical'"; "Humphrey . . . can be expected, if he

11  prosecutes further patents related to the one at issue here, to discuss new directions for Presidio's

12  technology.").   *See also Motorola,* 1994 U.S. Dist. LEXIS 20714, at *10-15, 1994 WL 16189689

13  at *4-5 (patent prosecution bar imposed; "[litigation] attorneys who receive confidential

14  information and then later prosecute patents [would] have to distil and compartmentalize the

15  confidential knowledge they have gained," they "would have to constantly challenge the origin

16  of every idea, every spark of genius.   This would be a Sisyphean task, for as soon as one idea

17  would be stamped 'untainted', another would come to mind.   The level of introspection that

18  would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical

19  the . . . attorneys may be.")

20         BD's insert concerning the patent prosecution bar largely ignores this Court's thoughtful

21  analysis in *Presidio Components*.   Instead, BD cites to a contrary line of cases exhibiting a

22  hostility to prosecution bars.   This Court, however, has already reviewed those cases – including

23  the *Sibia*, *Avocent* and *AFP* cases cited repeatedly by BD – and reached a different conclusion.

24  546 F. Supp. 2d at 956.

25              3.      BD's Argument That It Would Suffer Hardship Unless It
                        Can Disclose Gen-Probe's Highly Confidential Information
26                      To Its Patent Prosecution Counsel Is Without Merit

27         During the meet-and-confer process, BD's counsel argued that BD would be unfairly

28  prejudiced if it could not disclose Gen-Probe's "Highly Confidential" information to patent

1   prosecution counsel because it intended to take advantage of the technical expertise of those

2   individuals to assist with the case.  (Swinton Decl., ¶ 9.)  (As noted above, BD counsel Mr. Ware

3   refused to disclose how many of his colleagues at Foley Hoag would be affected by the

4   prosecution bar.)  BD's insert on this subject contains conclusory assertions to the same effect.

5   The Court has rejected this sort of argument in the past.  *Presidio Components*, 546 F. Supp. 2d

6   at 956-57, 959 ("Presidio does not show that it will be prejudiced by receiving advice from other

7   lawyers [not involved in patent prosecution]").

8          BD is a sophisticated party and it has long been aware of the courts' prevalent practice of

9   barring litigation counsel from engaging in patent prosecution.  BD has entered into protective

10  orders imposing such bars in the past.  Furthermore, BD was at least constructively aware of this

11  Court's published *Presidio Components* decision when it retained both of its outside law firms.

12  Thus, it is simply not credible for BD to argue that it has suffered surprise or prejudice from a

13  protective order containing such a bar.

14              4.      Conclusion

15         The reality is that BD will not be harmed by a prosecution bar.  It has a team of litigators

16  to work the litigation and it does not need the involvement of patent prosecution counsel.  The

17  prosecution bar will create a level playing field for all parties.  Gen-Probe's lawyers will be

18  subject to the same restrictions and will need to rely upon non-prosecuting attorneys or outside

19  consultants as well.  Conversely, the refusal to enter a prosecution bar would unnecessarily

20  expose Gen-Probe to the risk of substantial harm, as its "Highly Confidential" information would

21  be given to the same persons who pose the greatest risk of causing competitive injury to Gen-

22  Probe through inadvertent disclosure or otherwise.

23                          **BD's Argument**

24         Gen-Probe's proposed prosecution bar is extraordinarily broad.  It would apply to outside

25  counsel who "materially assists" in any patent application concerning "molecular diagnostic tests

26  and molecular diagnostic instrument systems" for two years after this litigation is over, including

27  any and all appeals.  The "technology field of molecular diagnostic test and molecular diagnostic

28  instrument systems" – in effect the entire field of molecular diagnostics – is extremely broad,

including many technologies to identify and characterize molecules such as nucleic acids, proteins, metabolites, and toxins for diagnostic, prognostic and personalized medicine applications. Further, Gen-Probe proposes a broad prosecution bar that would apply to any current or future client of Foley Hoag LLP and Knobbe Martens. This would unreasonably limit the ability of attorneys and technology specialists working on this case to provide advice to many clients with whom Gen-Probe does not compete and constrain them from pursuing their own career opportunities, including patent prosecution in the life sciences and future in-house counsel positions. As explained below, a prosecution bar is unnecessary and inappropriate in this case and would be highly prejudicial to Becton, Dickinson and Company and its litigation counsel, both at Foley Hoag and Knobbe Martens.

### 1.  Factual Considerations

**Foley Hoag, LLP.** Foley Hoag does not prosecute any patent applications for BD. Foley Hoag has represented BD in commercial litigation – including patent litigation – for decades in dozens of prior litigation matters. None of the attorneys from Foley Hoag are involved in any way in "competitive decision-making" at BD, including decisions concerning product design, development, pricing, or patent protection. None of the attorneys of record from Foley Hoag, Mr. Ware, Ms. Fiacco, and Mr. Carroll, is a member of the patent bar (and therefore they cannot prosecute patent applications in the Patent Office). Each of these attorneys, however, consults with clients concerning issues arising during prosecution, such as the disclosure of material information to the Patent Office.[6] Mr. Ware's and Ms. Fiacco's litigation practices focus heavily on life sciences intellectual property matters for universities, biotech companies, and medical device manufacturers. Gen-Probe's proposed bar would cause significant disruption to their practices. Fiacco Decl. ¶¶ 1-6.

Unlike Latham & Watkins, which we understand does not prosecute patents, Foley Hoag has a small patent prosecution group. This group currently includes sixteen attorneys and non-attorney technology specialists, the majority of whom focus their practice on molecular biology

---

[6] The broad prosecution bar proposed by Gen-Probe includes such consulting and advice within the scope of its prohibition on being "actively involved in" or "materially assisting" anyone in the prosecution of a patent.

and medical devices. *Id.* at ¶ 7. The firm's patent litigation practice relies heavily on patent prosecution personnel as active participants on litigation teams. *Id.* at ¶ 12. Thus far, the litigation team representing BD in this case have called upon at a number of patent prosecution associates and technology specialists. *Id.* The firm anticipates that it will rely further on these and other individuals to analyze BD and Gen-Probe technical materials, including "Highly Confidential" materials. *Id.* These individuals do "actively participate" and "materially assist" in the prosecution of patent applications for clients, in connection with patent applications in the field of molecular diagnostics. *Id.* Foley Hoag is currently prosecuting patent applications for at least eight clients in this field. *Id.* at ¶ 10. Under Gen-Probe's proposed bar, each associate assigned to Foley Hoag's litigation team would be precluded from their prosecution practice for many years to come, even if they later left Foley Hoag. Consequently, such individuals would simply be unavailable to assist BD in this litigation.

**Knobbe, Martens, Olson & Bear, LLP.** Knobbe Martens specializes in intellectual property law and has over 40 attorneys and patent professionals who are active in prosecuting patent applications in various areas of biotechnology. Anderson Decl. ¶¶ 4 & 10. Knobbe Martens has numerous clients whose research may be reasonably characterized as including "molecular diagnostic tests and molecular diagnostic instrument systems." *Id.* at ¶ 8. While both Mr. Zelkind and Mr. Anderson are registered patent attorneys, neither of them is involved in strategic decisions by BD concerning product design or development, pricing, marketing, or other competitive decisions. *Id.* at ¶¶ 3-4.

**Plaintiffs' counsel: Latham & Watkins, LLP.** To the best of BD's knowledge, Gen-Probe's counsel, Latham & Watkins, does not have a patent prosecution practice. Therefore, the broad prosecution bar Gen-Probe advocates for is one-sided: prejudicial to BD but unlikely to affect Gen-Probe's counsel.

1
2
3

   2.  Gen-Probe has not demonstrated any risk that Gen-Probe's "Highly Confidential" information will be used by BD's outside litigation counsel to prosecute patent applications to the prejudice of Gen-Probe.

4   As an initial matter, Gen-Probe owns the asserted patents and therefore faces no risk that

5 BD's counsel will use confidential information to expand the scope of the claims in any related

6 patent applications.[7] *See Phoenix Solutions, Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 580

7 (N.D. Cal. 2008) (*plaintiff's* attorney subject to "selective and specific" bar limited to

8 applications related to patents-in-suit); *Motorola, Inc. v. Interdigital Technology Corp.,* No. 93-

9 488, 1994 WL 16189689, at *5-6 (D. Del., Dec. 19, 1994) (prohibiting counsel from prosecuting

10 patent applications only as to the patentee, and only as to applications related to the patents in

11 suit); *Northbrook Digital, LLC v. Vendio Services, Inc.,* 625 F.Supp.2d 728, 759-760 (D. Minn.

12 2008) (noting that competitive decision-making is much more likely to be implicated "where

13 there is a relationship between the prosecution and the patents-in-suit"); *compare with Island*

14 *Intellectual Property LLC v. Promontory Interfinancial Network, LLC*, 658 F. Supp. 2d 615

15 (S.D.N.Y 2008) (fact that plaintiff's counsel was also prosecuting applications related to patents-

16 in-suit was ***not*** sufficient to establish that he should be subject to a bar).  As noted above, and

17 contrary to Gen-Probe's insinuations, Foley Hoag does not prosecute ***any*** patent applications for

18 BD.  Fiacco Decl. ¶ 4.

19   While Knobbe Martens prosecutes patent applications for an entity recently acquired by

20 BD, including applications that fall within the broad category of "molecular diagnostics," none

21 of those patent applications has any bearing on the present case – as noted above, the present

22 case is an infringement suit in which Gen-Probe has asserted patents against BD's products.

23 Anderson Decl. ¶¶ 8-9.  BD's existing and future patents thus have nothing to do with the present

24 litigation.

25
26

---

27 [7] If any party should be concerned about confidential information being used to expand the scope of continuing patent claims, that party is BD.  As one example, Gen-Probe is currently pursuing

28 ***at least fourteen*** pending patent U.S. applications that claim priority to the parent application from one of the asserted patents in this case, U.S. Pat. No. 7,118,892.

1     More generally, Gen-Probe has not specifically identified a single patent application, or

2    family of applications (owned by BD or any other entity), that Gen-Probe believes will pose a

3    threat to Gen-Probe if BD's litigation counsel is permitted to view "Highly Confidential"

4    information.  In that respect, Gen-Probe's vague allegations of potential prejudice are similar to

5    the allegations routinely rejected by the district courts and the Federal Circuit.  *See Sibia*

6    *Neurosciences, Inc. v. Cadus Pharm. Corp.*, 1997 WL 688174, *3 (S.D. Cal. 1997) (reversing

7    decision adopting broad prosecution bar).[8]

8              3.     Ethical rules governing outside counsel protect the parties'
                        "Highly Confidential" information.

9

10     The ethics rules governing attorneys, including the California Rules of Professional

11    Conduct, are more than sufficient to eliminate any concern by Gen-Probe that BD's litigation

12    counsel will use "Highly Confidential" information to further its representation of any

13    unspecified third-party competitors in patent prosecution matters.[9]  Indeed, BD and Gen-Probe

14    face many of the same competitors.  BD's litigation counsel have even greater access to BD's

15    confidential information than they will have to Gen-Probe's information.  Notably, BD has not

16    asked its litigation counsel to agree to restrict their practice other than as would be required by

17    existing ethical rules.  Gen-Probe has not provided any reason for this Court to impose a stricter

18    requirement than those that by which counsel are already bound.  *Nazomi Commc'ns., Inc. v.*

19    *ARM Holdings PLC*, No. C-02-02521-JF, 2002 U.S. Dist. LEXIS 21400, at *8-*9 (N.D. Cal.,

20

21   [8] *See also AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., Inc.,* No. 05-3006, 2006
WL 47374, *2 (E.D. Penn. 2006) (refusing to include prosecution bar "without some tangible

22   reason or good cause other than the general threat of inadvertent misuse"); *Avocent Redmond
Corp. v. Rose Electronics, Inc.*, 242 F.R.D. 574, 579 (W.D. Wash. 2007) (rejecting prosecution

23   bar request based on "vague and generalized threat of future inadvertent misuse of discovered
materials"); *Warner Chilcott Laboratories Ireland Ltd. v. Impax Laboratories, Inc.*, No. 08-

24   6304(WJM), 2009 WL 3627947, *3 (D.N.J., Oct. 29, 2009) (rejecting request for blanket
prosecution bar based on vague possibility of unintentional use of confidential information).

25   [9] California ethics rules impose a duty on all attorneys to "maintain inviolate the confidence, and
at every peril to himself or herself to preserve the secrets, of his or her client."  California

26   Business and Professions Code, § 6068(e)(1).  The parties agree that this Court's Protective
Order will impose at least an equal duty with respect to the treatment of an opposing party's

27   confidential information.  For example, the agreed-upon Order includes a provision that
attorneys may only use information for purposes of this litigation.  *See AFP*, 2006 WL 47374, *2

28   (rejecting proposed prosecution bar where protective order required counsel to use information
only for purposes of the pending litigation).

1   October 11, 2002) (citing Rules or Professional Conduct and refusing to bar counsel from

2   prosecuting applications for third-parties).[10]

3            4.      BD's outside litigation attorneys are not "competitive
                     decision makers" for BD.

4

5            As this Court noted in its 2008 decision in *Presidio v. American Technical Ceramics*, the

6   "key inquiry" in assessing the appropriateness of a prosecution bar is whether the outside

7   attorneys act as "competitive decision-makers" of their client. *Presidio Components, Inc. v. Am.*

8   *Tech. Ceramics Corp.*, 546 F.Supp.2d 951, 955 (S.D. Cal. 2008). The Federal Circuit used the

9   term "competitive decisionmaking" to refer to "counsel's activities, association, and relationship

10  with a client that are such as to involve counsel's advice and participation in any or all of the

11  client's decisions (pricing, product design, etc.) made in light of similar or corresponding

12  information about a competitor." *U.S. Steel Corp. v. U.S.*, 730 F.2d 1465, 1468 (Fed. Cir. 1984).

13  This analysis allows a court to asses the risk of "inadvertent disclosure" of discovery materials to

14  the client. *Id.* at 1468; *Avocent Redmond Corp. v. Rose Electronics, Inc.*, 242 F.R.D. 574,

15  577 (W.D. Wash. 2007).

16           BD's outside litigation counsel are not "competitive decision makers" in any sense of the

17  term.[11]  *See U.S. Steel*, 730 F.2d at 1468. Foley Hoag does not prosecute any patent applications

18  _____

19  [10] In fact, the Court in *Nazomi* also noted that restricting counsel's ability to advise other clients
     implicated Rule 1-500 of the California Rules of Professional Conduct, which prohibits *any*
20   agreement restricting an attorney's ability to practice law. <u>Id.</u> at *11, n. 3; Rule 1-500
     (discussion) ("the practice . . . of proposing that a member refrain from representing other clients
21   in similar litigation, is prohibited."). Notably, this provision of Rule 1-500 is broader than the
     counterpart provision of the model rules, which only prohibits such agreements in connection
22   with the settlement of a dispute. California's ethics rules, and California law, reflect a policy
     that strongly disfavors all non-competition provisions. *See Bayer Corp. v. Roche Molecular Sys.,*
23   *Inc.* 72 F. Supp. 2d 1111, 1119 (N.D. Cal. 1999) (citing California Business and Professions
     Code, § 16600).

24  [11] The Court's analysis in *U.S. Steel* was directed to whether ***in-house*** counsel were "competitive
25   decision makers" and noted that in cases where in-house counsel were found to be "competitive
     decision makers," companies may be forced to retain outside counsel. <u>Id.</u>  The court's remark
26   suggests that outside counsel will rarely qualify as competitive decision makers. *See Wi-Lan,*
     *Inc. v. Acer, Inc.*, 2009 WL 1766143, 3 (E.D. Tex., Jun. 23, 2009) (plaintiff failed to show
     evidence that defendant's in-house counsel were competitive decision makers); *R.R. Donnelley*
27   *& Sons Co. v. Quark, Inc.*, 2007 WL 61885, *2 (D.Del.,2007) (same); *Amgen, Inc. v. Elanex*
     *Pharm., Inc.,* 160 F.R.D. 134, 139 (W.D. Wash. 1994) (in-house counsel was not a "competitive
28   decision maker"); *Fluke Corp. v. Fine Instruments Corp.,* No. C94-573C, 1994 WL 739705, *4-
     6 (W.D. Wash., Oct. 6, 1994) (same).

CASE NO. 09-CV-2319 BEN (NLS)

1    for BD.  Fiacco Decl. ¶ 4.  *See Nazomi*, 2002 U.S. Dist. LEXIS 21400, at *3 (litigation counsel,

2    who did not prosecute applications for client, were "'outside counsel' in the truest sense of the

3    phrase.").  Nor do Foley Hoag attorneys participate in any strategic decisions concerning BD's

4    new product initiatives, product design, or pricing.  *Id.* at 5.  Foley Hoag is unaware of any

5    decision, from any court, that has imposed a bar on counsel under these circumstances.  *Compare*

6    *with Motorola*, 1994 WL 16189689, at *5-6 (prohibiting counsel from prosecuting patent for the

7    patentee); *Commissariat A L'Energie v. Dell Computer Corp.*, 2004 WL 1196965, *1 (D. Del.

8    2004) (imposing prosecution bar where plaintiff's attorneys prosecuted patent applications for

9    plaintiff).

10           Likewise, although Knobbe Martens does prosecute some patent applications for BD,

11   such prosecution activity does not, without more, render Knobbe Martens attorneys "competitive

12   decision makers."  *Sibia*, 1997 WL 688174 at *3 (reversing decision adopting prosecution bar

13   and warning that denying counsel access "on the ground that they also prosecute patents" for the

14   client "is the type of generalization counseled against in *U.S. Steel*").[12]  BD's counsel of record

15   at Knobbe Martens, Mr. Zelkind and Mr. Anderson, do not participate in decisions concerning

16   BD's development of new technology or strategic decisions concerning BD's product

17   development, design, or pricing.  Fiacco Decl. ¶ 3.  Gen-Probe has not identified any activity by

18   Mr. Zelkind and Mr. Anderson, other than the firm's patent prosecution activity, that could

---

[12] *See also Greenstreak Group, Inc. v. P.N.A. Const. Technologies, Inc*., No. 4:07-CV-2099, 2008 WL 2485177, *1 (E.D. Mo. 2008) (defendant's litigation counsel not involved in "competitive decision making" despite prosecuting patent applications for defendant); *Island Intellectual Property*, 658 F. Supp. 2d at 615 (fact that plaintiff's counsel was also prosecuting patents-in-suit was not sufficient to establish that he should be subject to a bar); *Avocent*, 242 F.R.D. at 579 ("status as a patent [prosecutor] alone is not enough to show advice and participation in competitive decisionmaking"); *Photoprotective Technologies, Inc. v. Insight Equity A.P. X, LP*, 2007 WL 2461819, *2 (W.D. Tex.,2007) (denying bar despite fact that plaintiff's counsel prosecuted applications for plaintiff); *Pergo, Inc. v. Faus Group, Inc.,* No. 5:05-cv-50-FL(1), 2005 U.S. Dist. LEXIS 40601, *19-20 (E.D.N.C. Sept. 20, 2005) (attorney not "competitive decision maker" despite the fact that he prosecuted patents for plaintiff).

*Methode Electronics, Inc. v. DPH-DAS LLC*, 2010 WL 174554, 4 (E.D. Mich., Jan. 19, 2010) (noting: "[I]t is not merely the fact that [patentee] Methode's chosen litigation counsel prosecutes patents generally that makes them 'competitive decisionmakers,' but rather, it is their active role and long tenure in specifically shaping Methode's bladder-based occupant detection technology patents," including patents related to patents-in-suit).

1    arguably be considered "competitive decision making" by Knobbe Martens attorneys.  *See U.S.*

2    *Steel*, 730 F.2d at 1468.

3           Because the attorneys at Foley Hoag and Knobbe Martens are not "competitive

4    decisionmakers" for BD, the broad prosecution bar proposed by Gen-Probe is not necessary and

5    not warranted.  *See Sibia,* 1997 WL 688174 at *3

6                  5.     Gen-Probe's reliance on this Court's decision in *Presidio* is
                          misplaced.
7

8           Gen-Probe's proposed prosecution bar tracks the language of the bar this Court adopted

9    in *Presidio v. American Technical Ceramics* (except than Gen-Probe's proposed bar is twice as

10   long).  The facts of this case, however, differ markedly from the facts underlying this Court's

11   decision in *Presidio*, 546 F.Supp.2d 951 (S.D. Cal. 2008).  In that case, defendant sought to

12   prevent plaintiff Presidio's counsel, Wood Herron & Evans ("WHE"), from prosecuting

13   additional applications in the same family as the asserted patent.  Defendants would have been

14   prejudiced had plaintiff's counsel been granted access to defendant's confidential information

15   while at the same time prosecuting related applications "in order to obtain new and modified

16   patent claims" covering defendant's products.  *Id.* at 955.  The prejudice in that case was

17   furthered because plaintiff Presidio's lead litigation counsel was also a "competitive decision

18   maker" concerning Presidio's patent portfolio, such that Presidio could expect its counsel to

19   make decisions concerning new directions for Presidio's technology.  *Id.* at 958.

20          As explained above, none of those circumstances exist in this case.  In fact, the

21   circumstances of this case are quite the opposite -- plaintiff Gen-Probe seeks to bar defendant's

22   counsel from participating in any prosecution activity in broad areas of technology.[13]   In

23   *Presidio*, the Court offered attorneys a choice: "either prosecute future patents in this family of

24   patents, or litigate the patent at issue, but not both."  *Id.* at 958.  In the present case, the patents

25   _____

26   [13] In fact, the facts of this case are the converse of the facts in the majority of cases in which a
     patent prosecution bar has been adopted, which typically concern a defendant's request to bar
27   plaintiff's counsel who oversees prosecution of applications related to the patents-in-suit.  *See,
     e.g., Vishay Dale Electronics, Inc. v. Cyntec Co., Ltd.*, 2008 WL 4372765, *5 (D. Neb.,
28   Sep. 22, 2008) (adopting bar where plaintiff's counsel had "overall responsibility for advising
     the plaintiff on patent prosecution matters" concerning related patents).

1   "at issue" are Gen-Probe's patents.  Any pending or future applications in the "family" of those

2   patents also belong to Gen-Probe.  It is therefore a gross distortion of *Presidio* for Gen-Probe to

3   suggest that BD's attorneys must now choose between 1) litigating Gen-Probe's patents or 2)

4   prosecuting any patent for any client that happens to fall into the broad and nebulous category of

5   "molecular diagnostics."  Such a restriction on the existing patent prosecution business of Foley

6   Hoag and Knobbe Martens is unduly burdensome and restrictive.  Further, the proposed bar is

7   one-sided, in that it likely will not affect Gen-Probe's outside counsel at all.

8         The facts of this case – specifically the relationship between BD and its outside counsel

9   at Foley Hoag and Knobbe Martens – more closely parallel the extensive body of precedent

10   refusing to follow cases like *Motorola* and *Commissariat*, and rejecting requests for prosecution

11   bars as unnecessary and overly prejudicial.[14]  For example, in *Sibia*, the Federal Circuit affirmed

12   a district court's rejection of a plaintiff's request to bar defense counsel where: (i) there was no

13   identification of prejudice other than the fact that defense counsel also prosecuted patents for the

14   defendant (in addition to 50 other clients), and (ii) there was no showing that defense counsel

15   was a "competitive decision maker" for the defendant's patent portfolio.  *See Sibia*, 1997 WL

16   688174 at *3

17               6.     BD would be prejudiced by the proposed prosecution bar.

18         The prosecution bar proposed by Gen-Probe would highly prejudice BD's ability to

19   defend this case.  *Avocent*, 242 F.R.D. at  577 ("In addition to determining whether an attorney is

20   a competitive decision-maker, courts must also consider whether denying that attorney access to

21   confidential material would work a substantial hardship" on the client).  As noted above, the

22   scope of Gen-Probe's prosecution bar – in effect, the ***entire field*** of molecular diagnostics – is

23   extraordinarily broad.  The proposed bar is far beyond the subject matter of the asserted patents:

24   a penetrable cap, the use of bleach to inhibit nucleic acids from further amplification, and the

25   automation of well-known isolation, amplification and detection processes in a "stand-alone

---

26   [14] *See, e.g., AFP*, 2006 WL 47374, *2 (refusing to include prosecution bar based on "general

27   threat of inadvertent misuse"); *Avocent*, 242 F.R.D. at 579 (same); *Warner Chilcott*, 2009 WL 3627947, *3 (same); *Nazomi*, 2002 U.S. Dist. LEXIS 21400, at *8-*9 (rejecting proposed

28   prosecution bar where counsel of record did not prosecute patent applications for party); *Island Intellectual Property* 658 F. Supp. 2d at 615.

unit."  Moreover, the proposed prosecution bar also covers subject matter and clients that is way beyond what could reasonably be considered as a competitive threat to Gen-Probe or its products.  Such a bar would be highly prejudicial.

Foley Hoag's litigation team will include a number of attorneys and technical specialists that do prosecute patent applications (for clients other than BD), including individuals with relevant technical expertise.  Fiacco Decl. ¶ 12.  Foley Hoag relies on such individuals as part of its litigation teams.  *Id*.  Further, BD has already made a substantial investment in educating the Foley Hoag litigation team, enabling them to prepare BD's defense.  *Id*. at ¶ 13.  The bar proposed by Gen-Probe would create a hardship to BD by effectively precluding technically knowledgeable Foley Hoag personnel from assisting BD any further in this case.[15]  *Id*. at ¶ 12.  Moreover, the proposed bar, and the resulting unavailability of patent associates and technical specialists, would disrupt Foley Hoag's continuing representation of BD.  *See id*. Likewise, BD intends to rely on the technical expertise of Mr. Zelkind and Mr. Anderson at Knobbe Martens, who have also invested time and effort to become familiar with the patents and products at issue in this case.  *See id.*; Anderson Decl. ¶ 11.

### 7.    Conclusion

Finally, it is noteworthy that the two provisions of the protective order proposed by Gen-Probe, in combination, would cause very significant prejudice to BD's defense of this litigation. First, Gen-Probe proposes to define the scope of "Highly Confidential" information so broadly as to preclude BD's in-house counsel from participating in litigation decisions, including the assertion of certain defenses, and review of briefing on key issues.  Then Gen-Probe proposes to limit the personnel resources of BD's outside counsel, by barring such personnel involved in this matter from pursuing their profession as patent prosecutors.  For the reasons set forth above,

---

[15] *See U.S. Steel*, 730 F.2d at 1468 ("forcing USS to rely on newly retained counsel would create an extreme and unnecessary hardship"); *Sibia*, 1997 WL 688174, *3 (describing hardship to client as "serious and unnecessary" where outside counsel had been involved for more than a year prior to suit); *Avocent*, 242 F.R.D. at 579 (rejecting prosecution bar where client had invested substantially in counsel)

1    Gen-Probe's proposed provisions of the protective order should be rejected in favor of BD's

2    proposed provisions.

3

4    Dated: March 8, 2010                          LATHAM & WATKINS LLP

5
                                                   By:  /s/ Stephen P. Swinton
6
                                                       Attorneys for Plaintiff and Counterdefendant
7                                                      GEN-PROBE INCORPORATED

8    Dated: March 8, 2010                          FOLEY HOAG LLP

9
                                                   By:  /s/ Barbara A. Fiacco (w/permission)
10
                                                       Attorneys for Defendant and
11                                                     Counterclaimant BECTON, DICKINSON
                                                       AND COMPANY
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 09-CV-2319 BEN (NLS)

1    **PROOF OF SERVICE**

2         I am employed in the County of San Diego, State of California.  I am over the age of

3    18 years and not a party to this action.   My business address is Latham & Watkins LLP,

4    12636 High Bluff Drive, Suite 400, San Diego, CA 92130.

5         On March 8, 2010, I served the following document described as:

6         1.    Joint Motion For Determination Of Terms In The Protective Order

7         2.    Declaration of Daniel L. Kacian, Ph.D., M.D., in Support of Gen-Probe
               Incorporated's Positions in Joint Motion for Determination of Terms in the
8              Protective Order

9         3.    Declaration of Stephen P. Swinton in Support of Gen-Probe Incorporated's
               Positions in Joint Motion for Determination of Terms in the Protective Order

10        4.    Declaration of Barbara A. Fiacco in Support of Becton, Dickinson and
               Company's Positions in the Joint Motion for Determination of Terms in the
11             Protective Order

12        5.    Declaration of Erik T. Anderson in Support of Becton, Dickinson and Company's
               Positions in the Joint Motion for Determination of Terms in the Protective Order

13   by serving a true copy of the above-described document in the following manner:

14                         **BY ELECTRONIC FILING**

15        I am familiar with the United States District Court, Southern District of California's

16   practice for collecting and processing electronic filings.   Under that practice, documents are

17   electronically filed with the court.   The court's CM/ECF system will generate a Notice of

18   Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the

19   case.   The NEF will constitute service of the document.   Registration as a CM/ECF user

20   constitutes consent to electronic service through the court's transmission facilities.   Under said

21   practice, the following CM/ECF users were served:

22        Boris Zelkind, Esq.                    Donald R. Ware, Esq.
            boris.zelkind@kmob.com                 dware@foleyhoag.com
23        Erik T. Anderson, Esq.                 Barbara A. Fiacco, Esq.
            erik.anderson@kmob.com                 bfiacco@foleyhoag.com
24        Knobbe, Martens, Olson & Bear LLP      Brian C. Carroll, Esq.
          550 West C Street, Suite 1200            bcarroll@foleyhoag.com
25        San Diego, CA 92101                    Foley Hoag LLP
                                                 Seaport West
26                                               155 Seaport Boulevard
                                                 Boston, MA 02210-2600
27

28

1        I declare that I am employed in the office of a member of the Bar of, or permitted to

2    practice before, this Court at whose direction the service was made and declare under penalty of

3    perjury under the laws of the State of California that the foregoing is true and correct.

4        Executed on March 8, 2010, at San Diego, California.

5

6                                            Stephen P. Swinton
                                        steve.swinton@lw.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28