1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| GEN-PROBE INCORPORATED,  ) | Civil No. 09cv2319 BEN (NLS) |
| ) | |
| Plaintiff,  ) | **ORDER GRANTING IN PART JOINT** |
| v.  ) | **MOTION FOR PROTECTIVE ORDER** |
| ) | **TO DETERMINE PARTIES' DISPUTE** |
| BECTON, DICKINSON AND COMPANY,  ) | **REGARDING ISSUE NO. 2 IN THE** |
| ) | **PROTECTIVE ORDER** |
| Defendant.  ) | |
| ————————————————  ) | [Doc. No. 27] |
| ) | |
| BECTON, DICKINSON AND COMPANY,  ) | |
| ) | |
| Counterclaimant,  ) | |
| v.  ) | |
| ) | |
| GEN-PROBE INCORPORATED,  ) | |
| ) | |
| Counterdefendant.  ) | |
| ————————————————  ) | |

11

12

13

14

15

16

17

18

19

20

21        Plaintiff Gen-Probe, Inc. (Gen-Probe) develops and sells nucleic acid tests and corresponding

22   equipment used to detect disease-causing microorganisms and to screen donated human blood.  Compl.

23   ¶ 1.  By incorporating its patented technology, the TIGRIS® System, Gen-Probe fully automated the

24   process for blood screening.  Compl. ¶ 4.  Gen-Probe alleges that defendant Becton, Dickinson and

25   Company (BD) and its "BD Viper™ with XTR™ Technology" nucleic acid testing system infringes

26   U.S. Patent Nos. 7,560,256 ('256 patent), 7,560,255 ('255 patent), 7,524,652 ('652 patent), 7,482,143

27   ('143 patent), 7,118,892 ('892 patent) and 5,612,200 ('200 patent).  Compl. ¶¶ 7-12, 16-39.  It also

28   alleges that BD's "BD ProbeTec™" DNA Assays infringe U.S. Patent Nos. 7,294,308 ('308 patent) and

1    6,893,612 ('612 patent).  Compl. ¶¶ 13-14, 40-47.  BD asserted counterclaims for declaratory judgment

2    of invalidity against Gen-Probe's eight asserted patents.

3         The court held a Case Management Conference (CMC) on February 26, 2010.  Following the

4    CMC the court issued several rulings regarding scheduling and the parameters for discovery.  It also

5    ordered counsel to meet and confer regarding a joint proposed protective order to govern the production

6    of documents in this case.  Because the parties could not agree to all terms in the protective order, they

7    filed this joint motion asking the court to determine two disputed terms in the protective order.

8         On March 11, 2010, the court issued an order explaining it had sufficient information before it to

9    determine the first issue presented in the joint motion.  It determined that first issue regarding the

10    definition of "Highly Confidential" information in an order dated March 15, 2010.  Also in the March

11    11 Order, the court set a schedule for further briefing of the second issue regarding Gen-Probe's

12    proposed patent prosecution bar.  In the second issue, Gen-Probe asks this court to implement a term to

13    preclude all of BD's outside counsel from reviewing some of its "Highly Confidential" information, if

14    that counsel engages in patent prosecution for any client in the area of "molecular diagnostics."

15         For good cause shown, the court **GRANTS in part** the joint motion to determine the second

16    issue raised in the proposed protective order, denies without prejudice the request to impose a

17    prosecution bar, and imposes a requirement that any as-of-yet undisclosed outside counsel who

18    prosecutes patents or materially assists in the prosecution of patents, before reviewing the opposing

19    party's "Highly Confidential" information, disclose to the other side his or her involvement in patent

20    prosecution.

21    **Issue #2: Whether the Protective Order Should Include a Prosecution Bar on Persons Having
      Access to Information Designated "Highly Confidential."**

22

23         The parties disagree on whether to implement a patent prosecution bar on persons having access

24    to certain categories of information designated "Highly Confidential."[1]  Gen-Probe proposes to insert

25

26         [1]In response to the court's order, Gen-Probe offered to limit the scope of the proposed
   prosecution bar by allowing prosecution counsel to review subsections (a) and (c) in the definition of

27    "Highly Confidential" information, which includes Gen-Probe's financial information.  This would thus
   create a third category of information in the protective order, "Highly Confidential - No Prosecution

28    Counsel."  Given the ruling in this Order, Gen-Probe may, but is not required, to revise the definition of
   "Highly Confidential" information.

1 the following paragraph in the protective order while BD opposes insertion of this paragraph and

2 imposition of a patent prosecution bar:

3       Subject to the restrictions set forth in Paragraph 8 above, information
        designated "HIGHLY CONFIDENTIAL" may not be viewed by any
4       person who is actively involved in, or materially assists others who are
        actively involved in, prosecuting patents in the technology area of
5       molecular diagnostic tests and molecular diagnostic instrument systems
        (hereinafter the "Technology Area").  To ensure compliance with this
6       provision, the parties shall create an ethical wall between those persons
        with access to information designated "HIGHLY CONFIDENTIAL"
7       under this Order and those individuals who prosecute or materially assist
        others who prosecute patents in the Technology Area.  In addition, any
8       individual otherwise qualified to view information designated "HIGHLY
        CONFIDENTIAL" under the terms of Paragraph 8 and this Paragraph
9       shall be barred from prosecuting or materially assisting others involved in
        prosecuting patents in the Technology Area for a period of two (2) years
10      following the final termination of this action, including any and all
        appeals.[2]

11

12      **1.      Relevant Facts.**

13      BD has retained two law firms to represent it in this matter, Foley Hoag LLP (Foley Hoag) in

14 Boston, and Knobbe Martens Olson & Bear LLP (Knobbe Martens) as local counsel.  Both firms have a

15 patent prosecution practice.  BD intends to use patent prosecutors at both firms to review discovery

16 information.  Swinton Decl. 1 ¶ 9.  In their meet and confer efforts leading up to the filing of the joint

17 motion, BD's counsel did not disclose to Gen-Probe's counsel how many and which defense counsel

18 would be affected by Gen-Probe's proposed prosecution bar.  Swinton Decl. 1 ¶¶ 11, 18.  But BD

19 disclosed that people at Knobbe Martens were actively prosecuting patents for a BD subsidiary in the

20 field of nucleic acid tests and instrument systems.  Swinton Decl. 1 ¶ 10.  Boris Zelkind of Knobbe

21 Martens did not specify which BD subsidiary or how many people at his firm were involved.  *Id.*

22      According to the declarations of counsel, Foley Hoag has a prosecution practice that consists of

23 approximately 16 attorneys and non-attorney technical specialists.  Fiacco Decl. 1 ¶ 7.  Foley Hoag is

24 currently prosecuting hundreds of patent applications for at least eight clients in the field of molecular

25 diagnostics, the area of technology that would be subject to the prosecution bar.  Fiacco Decl. 1 ¶ 10.

26 Knobbe Martens specializes in intellectual property law and has over 40 attorneys and non-attorney

27 ──────────

28      [2]In supplemental briefing Gen-Probe proposes to decrease this time frame to within two years
from the disclosure of such technical information or one year after the conclusion of the litigation,
including any appeals, whichever is longer.

1  technical specialists who actively prosecute patent applications.  Zelkind Decl. ¶ 5; Anderson Decl. 1 ¶¶

2  4, 10.  A large portion of its business stems from patent prosecution services in the biotechnology field,

3  including prosecution in the area of molecular diagnostic tests and instrument systems.  Anderson Decl.

4  ¶¶ 5-8.  Knobbe Martens has numerous clients whose research may be characterized as molecular

5  diagnostic tests and instruments, and they have represented some of these clients for several years.

6  Anderson Decl. 1 ¶ 8.

7       Foley Hoag does not prosecute any patents for BD.  Fiacco Decl. 1 ¶ 5.  But its patent litigators

8  rely heavily on the patent prosecutors as active members of litigation teams, and intend to rely on those

9  members to analyze Gen-Probe's "Highly Confidential" information.  Fiacco Decl. 1 ¶ 12.  Foley Hoag

10  explains that these team members "actively participate" and "materially assist" in prosecuting patent

11  applications for clients in the field of molecular diagnostics.  Fiacco Decl. 1 ¶ 12.  Foley Hoag has

12  represented BD in commercial litigation for decades.  Fiacco Decl. 1 ¶ 3.  BD has made a substantial

13  investment in educating the Foley Hoag and Knobbe Martens teams concerning the subject matter of

14  this litigation.  Fiacco Decl. 1 ¶ 13; Anderson Decl. 1 ¶ 11.

15       None of BD's litigation attorneys of record for this matter, including Donald Ware, Barbara

16  Fiacco and Brian Carroll of Foley Hoag, and Boris Zelkind and Erik Anderson of Knobbe Martens, are

17  involved in BD's strategic decisions regarding product design or development, pricing, marketing or

18  other competitive decisions.  Fiacco Decl. 1 ¶ 5; Fiacco Decl. 2 ¶¶ 4-5; Anderson Decl. 1 ¶ 3; Anderson

19  Decl. 2 ¶ 4; Russell Decl. ¶ 9; Sollins Decl. ¶ 6; Peaslee Decl. ¶ 5; Choi Decl. ¶ 9.  While Mr. Zelkind is

20  a member of the patent bar, he no longer prosecutes patents and focuses exclusively on intellectual

21  property litigation.[3]  Zelkind Decl. ¶ 2; Anderson Decl. 1 ¶¶ 3-4; Swinton Decl. 1 ¶ 18.  Mr. Ware, Ms.

22  Fiacco and Mr. Carroll are not members of the patent bar; however they consult with clients regarding

23  issues arising during patent prosecution that affect pending or potential patent litigation, such as

24  disclosure of material to the United States Patent and Trademark Office (Patent Office).  Fiacco Decl. 1

25  ¶ 6.

26       Knobbe Martens prosecutes patents for two BD subsidiaries, HandyLab, Inc. and GeneOhm

27

28       [3]Likewise, both Mr. Swinton and Mr. Long, counsel to Gen-Probe, are admitted to practice
before the Patent Office but no longer prosecute patents.  Swinton Decl. 1 ¶ 18.

1  Technology.  Anderson Decl. 2 ¶¶ 8, 10.  The court separately addresses the issues involved with the

2  BD subsidiaries later in this Order.

3          2.          **Applicable Law.**

4          When deciding whether one side's patent prosecutor should have access to the opposing party's

5  confidential information, courts must balance the "one party's right to broad discovery and the other

6  party's ability to protect its confidential materials from misuse by competitors."  *Avocent Redmond*

7  *Corp. v. Rose Electronics*, 242 F.R.D. 574, 577 (W.D.Wash. 2007) (citing *U.S. Steel Corp.,* 730 F.2d

8  1465, 1468 (Fed. Cir. 1984)).  The key inquiry is whether the attorney in question is in fact a

9  competitive decision maker.  *Id.* (citing *U.S. Steel Corp.,* 730 F.2d at 1470).  The court must also

10 balance the risk of inadvertent disclosure of confidential information to competitors against the risk of

11 impairment of litigation.  *See, e.g., Interactive Coupon Mktg. Group, Inc. v. H.O.T.! Coupons, LLS*,

12 1999 U.S. Dist. LEXIS 12437, *2 (N.D. Ill. 1999).

13          A.          **Majority View.**

14          In the majority view, where a company's patent prosecutor also engages in competitive decision

15 making for that company, the prosecutor must be barred from accessing the opposing party's

16 confidential information.  *See, e.g., Motorola, Inc. v Interdigital Technology Corp.,* 1994 U.S. Dist.

17 LEXIS 20714 (D. Del. 1994) (prohibiting outside counsel who already received plaintiff's confidential

18 information from prosecuting patents for defendant for one year after litigation ended); *Infosint S.A. v.*

19 *Lundbeck*, 2007 U.S. Dist. LEXIS 36678 (S.D.N.Y. 2007) (imposing bar where plaintiff's attorney was

20 making decisions regarding competitors and assisting in the prosecution of the patents-in-suit).  In some

21 cases, the fact that an attorney engages in patent prosecution is sufficient to find that the attorney is also

22 a competitive decision maker for the party: "Prosecuting patent applications 'involves decisions of

23 scope and emphasis' that implicate competitive decision making, as claims may be drafted to 'read on

24 new products and new directions where [a party] project[s] sales to be most critical.'" *Commissariat A*

25 *L'Energie Atomique v. Dell Computer Corp.,* 2004 U.S. Dist. LEXIS 12782, *8 (D. Del. 2004) (barring

26 plaintiff's attorneys from accessing defendant's highly confidential information because they were

27 prosecuting patents involving the technology at issue) (quoting *Motorola*, 1994 U.S. Dist. LEXIS 20714

28 at *7-*8, *11); *In re Papst Licensing, GmbH, Patent Litig.*, 2000 U.S. Dist. LEXIS 6374 (E.D. La.

1   2000) (defining advice related to patent prosecution as competitive decision making); *Chan v. Intuit,*

2   *Inc.*, 218 F.R.D. 659, 662 (N.D. Cal. 2003) (defining advice on the scope of patent claims as competitive

3   decision making).

4           In other cases, courts have made more specific findings regarding patent prosecution and other

5   factors, including who is the attorney at issue, the attorney's relationship with the party, and the specific

6   type of prosecution work undertaken for that client, to show that the attorney is a competitive decision

7   maker. *See, e.g., Methode Electronics, Inc. v. DPH-DAS LLC*, 2010 U.S. Dist. LEXIS 3604 (E.D. Mich.

8   2010) (finding risk that plaintiff's attorney could inadvertently apply the defendant's information to

9   shape claims for plaintiff in then-pending continuation proceedings for the patents at issue and make

10   claims "read" on new products rendered him a competitive decision maker); *Presidio Components, Inc.*

11   *v. Amer. Technical Ceramics Corp.*, 546 F. Supp. 2d 951, 958 (S.D. Cal. 2008) (Stormes, J.) (imposing

12   prosecution bar for plaintiff's prosecution attorney who worked at same firm as litigation team because

13   he would be involved in decisions concerning scope and emphasis such as drafting claims to read on

14   new products and new directions where sales were projected to be more critical); *Phoenix Solutions, Inc.*

15   *v. Wells Fargo Bank, N.A.,* 254 F.R.D. 568, 580 n.3 (N.D. Cal. 2008) (entering prosecution bar for

16   plaintiff's patent prosecutor who functioned as an in-house counsel with authority to make competitive

17   business decisions even though plaintiff and defendant were not direct competitors).

18           **B.      Minority View.**

19           Under the minority view, patent prosecution, on its own, is insufficient to qualify an attorney as

20   a competitive decision maker. *In re Sibia Neurosciences, Inc.*, 1997 U.S. App. LEXIS 31828 (Fed. Cir.

21   1997). The minority view cases rely on *In re Sibia* for the rule that no prosecution bar should be entered

22   for patent prosecutors unless there is other specific evidence that the attorney is a competitive decision

23   maker. *See, e.g., Avocent*, 242 F.R.D. 574 (allowing plaintiff's prosecutors access to defendant's

24   confidential information because defendant showed only a "vague and generalized threat of future

25   inadvertent misuse of discovered materials"); *Island Intellectual Prop. LLC v. Promontory*

26   *Interfinancial Network*, 658 F. Supp. 2d 615 (S.D.N.Y. 2009) (finding counsel did not participate in

27   activities such as pricing and product design and thus was not a competitive decision maker);

28   *Greenstreak Grp., Inc. v. P.N.A. Construction Technologies, Inc.*, 251 F.R.D. 390 (E.D. Mo. 2008)

1   (finding outside counsel were not involved in pricing and product design and thus were not competitive

2   decision makers); *AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg. Inc.,* 2006 U.S. Dist.

3   LEXIS 426 (E.D.Penn. 2006) (finding the threat of inadvertent use of defendant's confidential

4   information, on its own, is not enough to justify barring plaintiff's attorneys from prosecuting similar

5   patents for two years); *Pergo, Inc. v. Faus Grp., Inc.*, 2005 U.S. Dist. LEXIS 40601 (E.D.N.C. 2005)

6   (finding counsel did not advise on product pricing, design, invention, research, development, marketing

7   or sales and thus was not a competitive decision maker).

8          This court has already rejected the minority view and distinguished *In re Sibia* on the grounds

9   that it was decided before the significant post-*Motorola* line of cases.  *See Presidio*, 546 F. Supp. 2d at

10  958.  While *In re Sibia* is a Federal Circuit case and a patent prosecution bar is unique to patent law,

11  several other courts have rejected *In re Sibia* because it is an unpublished case.  *See, e.g., Phoenix*

12  *Solutions*, 254 F.R.D. at 580 n.3.  Further, this issue arises in the context of the appropriate scope of a

13  protective order.  Fed. R. Civ. Proc. 26(c). Where issues of patent law control disposition of a discovery

14  dispute, the court must apply Federal Circuit law.  *Midwest Indus., Inc. v.  Karavan Trailers, Inc.*, 175

15  F.3d 1356, 1359 (Fed. Cir. 1999).  Here, however, the precedential effect of *In re Sibia* is disputed, and

16  the appropriate scope of a protective order is a matter generally committed to the sound discretion of the

17  district court.  *See* Fed.R.Civ.P. 26(c); *Phillips v. GMC*, 307 F.3d 1206, 1211 (9th Cir. 2002).

18                     **C.      Cases Addressing Scope of Prosecution Bar.**

19          Some of the cases that enter prosecution bars limit the bar to either only those patents at issue in

20  the litigation, or to any of the litigating party's patents related to the patents-in-suit.  *See, e.g.,*

21  *Interactive Coupon Mktg. Group,* 1999 U.S. Dist. LEXIS at *11 (barring plaintiff's counsel from

22  prosecuting "any patent application for plaintiff relating to the subject matter of the patents-in-suit").

23  Other cases have expanded the scope of the prosecution bar to apply not only to patents belonging to the

24  litigating parties, but to counsel's other clients who may have patents related to the technology at issue.

25  *See, e.g., Commissariat,* 2004 U.S. Dist. LEXIS at *8 (barring plaintiff's attorneys from accessing

26  defendant's highly confidential information because they were prosecuting patents involving the LCD

27  technology at issue for defendant's competitors); *Medtronic, Inc. v. Guidant Corp.,* 2001 U.S. Dist.

28  LEXIS 22805, *11 (D. Minn. 2001) (barring attorneys who received "Outside Attorneys Eyes Only"

1   information from participating for one year in prosecuting patents "for inventions related to the

2   treatment of abnormal cardiac rhythms"); *Cummins-Allison Corp. v. Glory Ltd.,* 2003 U.S. Dist. LEXIS

3   23653, *34-*35 (N.D. Ill. 2004) (barring counsel from prosecuting "any patent application relating to

4   the subject matter of the patents-in-suit").

5          Rather than focus the restriction on patent prosecutors, some courts have imposed the bar on

6   patent litigators where those litigators also advise patent prosecutors regarding issues in prosecution.

7   *See, e.g., Cheah IP LLC v. Plaxo, Inc.*, 2009 U.S. Dist. LEXIS 40823, *5-*6 (N.D. Cal. 2009) (rejecting

8   argument that litigators were not competitive decision makers based on litigators providing assistance to

9   patent prosecutors for patents related to patents-in-suit); *c.f. Nazomi Communications, Inc. v. Arm*

10  *Holdings PLC*, 2002 U.S. Dist. LEXIS 21400 (N.D. Cal. 2002) (finding litigators were not competitive

11  decision makers based on their firm's general patent prosecution practice because the firm did not

12  prosecute patents for plaintiff).

13         **3.      Prosecution Bar.**

14         This court must decide whether the BD attorneys who prosecute or materially assist others who

15  prosecute patents in the area of molecular diagnostic tests and instrument systems *for any client* should

16  be prohibited from reviewing Gen-Probe's most confidential technical information.  Gen-Probe argues

17  that BD's counsel should be forced to make a choice: either litigate this case or prosecute patents

18  involving molecular diagnostic tests and instrument systems, but not both.  Gen-Probe asks this court to

19  impose a prosecution bar like it did in *Presidio*, 546 F. Supp. 2d 951.  While the issue raised here bears

20  certain similarities to the issue presented in *Presidio*, there are important differences.  In *Presidio*,

21  plaintiff's litigation counsel had also prosecuted the parent patent and the patent-in-suit.  Consequently,

22  there was an appreciable risk that sensitive information received from the defendant might

23  unintentionally be used in prosecuting on-going patent applications for the plaintiff.  Here, the risk is

24  less apparent, as litigation counsel and prosecution counsel at the defendant's two law firms do not

25  prosecute any patents for BD.  They do, however, prosecute patents for other clients, including

26  subsidiaries of BD, in the same general area of technology.

27         Gen-Probe argues that a patent prosecution bar will create a level playing field for all parties

28  because its lawyers will also be subject to the prosecution bar.  Gen-Probe will look to non-prosecuting

1  attorneys or outside consultants for consultation on this litigation.  Gen-Probe argues there is good cause

2  to impose the bar based on the substantial evidence it provided in the joint motion of BD copying Gen-

3  Probe's patent submissions by prosecution counsel acting under BD's control.  Gen-Probe argues the

4  risk of inadvertent disclosure of its most guarded information is far outweighed by any burden imposed

5  on BD in this case.

6        BD advances several arguments against imposition of the prosecution bar.  First, it argues it will

7  be unfairly prejudiced if it cannot disclose Gen-Probe's "Highly Confidential" information to patent

8  prosecution counsel so as to use their technical expertise to help with this litigation.  Second, it argues

9  the proposed bar is unnecessary, and in any event is too broad in scope and duration because it would

10  apply to any current or future client of Foley Hoag or Knobbe Martens, and would restrain their

11  attorneys from pursuing their own career opportunities in patent prosecution in the life sciences and

12  future in-house counsel positions for years to come.  Third, BD argues that Gen-Probe has not

13  demonstrated any risk that its "Highly Confidential" information will be used by BD's outside litigation

14  counsel to prosecute patents to the prejudice of Gen-Probe.  Fourth, BD argues that the ethics rules

15  governing attorneys, including the California Rules of Professional Conduct, eliminate any concern that

16  BD's litigation counsel will use Gen-Probe's "Highly Confidential" information to further its

17  representation of any unspecified third-party competitors in patent prosecution matters.  Finally, BD

18  argues that Gen-Probe has not provided any reason why it requires greater protection than any former

19  client of Foley Hoag or Knobbe Martens receives.[4]

20            A.      Good Cause.

21        In the initial joint motion, Gen-Probe explained it became concerned, when in the meet and

22  confer, Mr. Zelkind disclosed that attorneys in his firm were currently prosecuting patents for a BD

23  subsidiary in the same technology area.  Mr. Zelkind, however, did not disclose any details regarding the

24  people involved or their involvement, if any, in this lawsuit.  Swinton Decl. 1 ¶ 10.  Mr. Ware, likewise,

25  _____

26  [4]BD argues that even though Gen-Probe has not shown good cause to implement the patent bar, this court has shifted the burden to BD by requiring it to submit declarations from outside counsel justifying why the bar should not be imposed.  This court has not alleviated Gen-Probe of the burden
27  under Rule 26(c) to show good cause.  Rather, the court ordered production of information that Gen-Probe had requested but that BD refused to produce.  This information was relevant to Gen-Probe's
28  argument for good cause and necessary to the court's consideration of whether Gen-Probe met its burden.

1  refused to disclose how many of his colleagues were engaged in similar activities.  Swinton Decl. 1 ¶

2  11.  Further, Gen-Probe explains that of the approximately 26,000 documents it produced evidencing the

3  conception, reduction to practice, design and development of each claimed invention, it designated only

4  56 documents as "Highly Confidential" that would be subject to the bar.  Gen-Probe asserts that those

5  documents are "exemplary invention documents that contain detailed molecular chemistry disclosures

6  regarding the design of the molecular diagnostic assays running on its TIGRIS commercial

7  embodiment" and are "inherent in the invention and reduction to practice of Gen-Probe's automation

8  patents."  Swinton Decl. 2 ¶ 7.

9        The failure of BD's counsel to discuss more details of their patent prosecution practices, coupled

10  with the proprietary value of the information in the documents at issue, constituted good cause to order

11  BD's counsel to provide further information regarding it patent prosecution practices.

12                    **B.        Competitive Decision Making.**

13        Gen-Probe argues that by virtue of their prosecuting patents for Gen-Probe's competitors in the

14  same technology area, patent prosecutors at Foley Hoag and Knobbe Martens engage in competitive

15  decision making.  Gen-Probe cites to many cases, including this court's decision in *Presidio*, where a

16  company's outside counsel involved in patent prosecution are competitive decision makers who should

17  either choose to prosecute patents or participate in the litigation.  Gen-Probe argues that a patent

18  prosecutor cannot effectively separate, in his or her mind, a competitor's confidential information

19  obtained through discovery from the strategic business decisions a prosecutor must engage in for the

20  benefit of a client.

21        Considering the risk that patent prosecutors from Foley Hoag and Knobbe Martens could

22  inadvertently apply Gen-Probe's information to shape claims for its competitors in patent prosecution

23  proceedings for patents related to the technology at issue, if based on a supporting factual record, those

24  patent prosecutors would be competitive decision makers.  However, without further information as to

25  who, exactly, those prosecutors are, and which patent applications they are prosecuting for which

26  clients, the court cannot affirmatively find that the collective and unknown group of patent prosecutors

27  at Foley Hoag and Knobbe Martens working on unknown patents are competitive decision makers.

28        To build a factual record, Gen-Probe asked for the identifications of the companies for which

1  Foley Hoag and Knobbe Martens prosecute patents in the technology area.  Swinton Decl. 2 ¶ 3.  In

2  response, Foley Hoag provided Gen-Probe a representative list of its molecular diagnostics clients.  *See*

3  Fiacco Decl. 2, Ex. A.  Knobbe Martens disclosed a BD subsidiary, but not a list.  Swinton Decl. 2 ¶ 3.

4  Gen-Probe asked this court to order BD's counsel to disclose their client lists so as to discover any

5  competitors.  Based on BD's expressed concerns regarding client confidentiality, such as disclosure of

6  clients working on new and unpublished patents, the court will not order BD to disclose those lists.

7      Gen-Probe also asks that BD disclose which patent prosecutors it will rely on for this litigation.

8  Regarding attorneys, BD cannot yet identify with certainty which attorneys it will rely on because the

9  case is in its initial stages, and counsel is not yet aware of the staffing needs required to review "Highly

10 Confidential" information, the role that each attorney will fulfill, or whether any specific attorney will

11 be indispensable to the litigation team.  Fiacco Decl. 2 ¶¶ 6-7.  Also, BD's counsel needs flexibility in

12 its staffing to address events that will inevitably occur over the length of a long patent case, such as

13 medical and parental leave, trials, and other professional and personal commitment.  Fiacco Decl. 2 ¶ 8;

14 Zelkind Decl. ¶ 6.  Further, BD's counsel argues it cannot anticipate their staffing needs because this is a

15 large case with eight asserted patents naming fifteen inventors, and there now also exists a second case

16 filed by Gen-Probe involving some of the same patents and accusing different BD products, and due to

17 the largess of these cases both firms require flexibility in staffing.  Zelkind Decl. ¶¶ 6-8; Fiacco Decl. 2

18 ¶¶ 6-9.  Notwithstanding these objections, Foley Hoag disclosed certain of its attorneys who may be

19 staffed on this case.  These Foley Hoag associates explained that none of the technical areas of their

20 prosecution work involve automation, automated devices or penetrable caps similar to the technology

21 asserted in Gen-Probe's patents.  Russell Decl. ¶ 7; Sollins Decl. ¶ 4; Choi Decl. ¶ 7; Anderson Decl. 2

22 ¶¶ 6, 12.

23    Based on these disclosures, Gen-Probe does not challenge any of the identified Foley Hoag

24 associates--Kimberly Peaslee, Hathaway Russell, Peter Sollins, and technical specialist Peter Choi--or

25 argue they are competitive decision makers who should be prevented from reviewing Gen-Probe's

26 "Highly Confidential" information.  Further, based on the representations of BD's counsel, Gen-Probe

27 does not believe that BD's principal trial counsel, Mr. Ware, Ms. Fiacco and Mr. Carroll, or its principal

28 local counsel, Mr. Zelkind, prosecute patents or materially assist others in the prosecution of patents,

1   and thus does not seek a prosecution bar against them.  Gen-Probe Reply, pp. 1, 9-10.

2         Based on this record, the court finds that there is not enough evidence to make a finding that

3   Foley Hoag's and Knobbe Martens' unidentified patent prosecutors working on unspecified patents for

4   unidentified clients are competitive decision makers.

5                    **C.      Balancing Test.**

6         The courts now employs a balancing test that weighs the risk of inadvertent disclosure of a

7   party's most confidential information against the opposing party's ability to litigate.  *See, e.g., In re*

8   *Papst Licensing, GmbH, Patent Litig.*, 2000 U.S. Dist. LEXIS 6374 (E.D. La. 2000) (restricting Papst's

9   counsel because risk of inadvertent disclosure outweighed any impairment on Papst's ability to litigate).

10  Gen-Probe argues it will suffer prejudice because it faces a risk of inadvertent disclosure of its

11  confidential information to undisclosed competitors other than BD.  In contrast, BD argues it will suffer

12  prejudice to its ability to litigate this case because its technically knowledgeable counsel would be

13  precluded from further assisting BD.  Fiacco Decl. 1 ¶ 12.  BD's representation would suffer and its

14  choice of counsel would be unduly prejudiced.  Zelkind Decl. ¶ 7.

15        BD's counsel argues a prosecution bar will cause the law firms and their clients severe prejudice.

16  For example, BD's outside counsel has an undivided duty of loyalty to each of its clients.  *See Flatt v.*

17  *Superior Court*, 9 Cal. 4th 275, 289 (1994).  If Gen-Probe's prosecution bar is imposed, BD's counsel

18  argues it would be forced to violate that duty of loyalty and choose between their clients.  If the bar is

19  imposed, for example, Foley Hoag and Knobbe Martens may decide that they prefer to prosecute patents

20  for several other clients in the technology area rather than litigate this case, so they would be forced to

21  withdraw as counsel for BD, which could prejudice BD.  Or, Foley Hoag and Knobbe Martens may

22  choose to litigate this case and abandon some of its patent prosecution activities, which could deprive

23  their patent prosecution clients of their choice of counsel and prejudice them in their proceedings.  Also,

24  by imposing the prosecution bar, counsel argues that Gen-Probe would receive more protection of its

25  confidential information than Foley Hoag's or Knobbe Martens' clients, as both firms prosecute patents

26  for multiple clients in this technology area without any limitation on their representation.  If those

27  clients--including BD--to which Foley Hoag and Knobbe Martens owe a duty of loyalty, have not asked

28  either of those firms to give up prosecuting patents for other competitors in the same area of technology,

1    BD argues it would be unfair to ask those firms to selectively eliminate their clients for the benefit of

2    Gen-Probe, to which those firms do not owe a duty of loyalty.[5]

3        Second, BD's counsel argues that such a bar could violate California Rule of Professional

4    Conduct 1-500, which prohibits any agreement that restricts an attorney's ability to practice law. *See*

5    *also Nazomi*, U.S. Dist. LEXIS at *8-*9 (presuming attorneys can abide by both terms of a protective

6    order and the Rules of Professional Conduct and only barring access where there is a significant danger

7    of inadvertent disclosure). If the bar is considered a covenant not to compete, it may be found

8    unenforceable. *See* Hricik Decl. ¶ 38.

9        Third, the bar could derail the careers of Foley Hoag's newer associates. For example, Foley

10   Hoag uses a contract attorney who has a Ph.D. in biophysical chemistry and who focused her graduate

11   work on molecular diagnostics. Peaslee Decl. ¶ 3. She became a member of the Massachusetts bar in

12   January 2010. Peaslee Decl. ¶ 2. She intends to develop a legal career that includes patent prosecution,

13   which may include work in the area of her education, molecular diagnostics. Peaslee Decl. ¶ 6. If

14   subject to the prosecution bar, she would be precluded from working, for what would likely be a

15   substantial period of time, in her area of education. Peaslee Decl. ¶ 7.

16       In light of these ethical and career-impacting concerns, the court finds that BD's outside counsel

17   would be prejudiced by imposition of the broad prosecution bar, and that such prejudice would

18   additionally flow to BD.

19               **D.    Scope of Technology in Prosecution Bar.**

20       Gen-Probe and this court asked BD to propose a limit to the prosecution bar. As first proposed,

21   Gen-Probe seeks to impose the bar on all patent prosecutors at Foley Hoag and Knobbe Martens who

22   work in the area of molecular diagnostics. Molecular diagnostics includes all of the tests and methods to

23   identify a disease or predisposition for a disease through analysis of an organism's molecules, such as

24

25       [5]BD explains that ethical obligations prevent prosecution attorneys from taking on future
     representation in a subject matter that bears a "substantial relationship" to the technology at issue in a
26   prior or current client relationship. Hricik Decl. ¶ 30. BD's expert opines that courts construe the
     "substantial relationship" requirement narrowly to protect the livelihoods of prosecuting attorneys as
27   well as their abilities to practice law. *Id.* The Patent Office has held that to be substantially related, two
     patents must be at least "substantially identical." Hricik Decl. ¶ 33; *Anderson v. Eppstein*, 59 USPQ 2d.
28   1280 (Bd. Pat. App. & Interf. May 11, 2001). Consequently, firms can represent multiple clients in the
     same space without conflict or risk of misuse of confidential information. Hricik Decl. ¶ 30.

1    DNA or RNA.  Fiacco Decl. 1 ¶ 8.  Some of the current and emerging applications of molecular

2    diagnostics include personalized medicine (i.e. custom treatment for a specific disease in a patient),

3    oncology (diagnostic and personalized medicine tests), antibodies, genetic testing for inherited disorders

4    and prenatal diagnosis, and predicting genetic risk of disease.  Fiacco Decl. 1 ¶ 9.  BD contends the

5    asserted patents, however, relate to only a narrow aspect of molecular diagnostics, specifically, a fully

6    automated stand-alone instrument for isolating, amplifying and detecting nucleic acids and the

7    penetrable caps for use with that instrument, and implies that any bar should be limited to this definition.

8    Based on this definition, BD asserts that the subject matter of the patents-in-suit is not relevant to any

9    molecular diagnostics patents currently being prosecuted by prosecutors at Foley Hoag or Knobbe

10   Martens.  BD Response, p.8.

11        Gen-Probe replies that BD's narrowed definition does not account for all the claims asserted in

12   these "automation" patents, which claim the molecular chemistry steps of "hybridizing," "amplifying,"

13   and "detecting" a target nucleic acid sequence.  Swinton Decl. 2 ¶ 6.  Gen-Probe points out that in BD's

14   196-topic document request it served on Gen-Probe on March 29, 2010, BD's demands went beyond

15   any "mechanical" subject category and demonstrates BD's real belief regarding the technology at issue:

16              All documents concerning the testing, manufacture, use, sale or offer for
             sale of the TIGRIS Instrument, including all engineering notebooks, notes,
17           memoranda, correspondence, e-mails, prototypes, engineering change
             orders, bills of material, research reports, development proposals, project
18           approvals, project summaries, new product disclosures or proposals,
             drawings, sketches, schematics, models, computer models, simulations,
19           manufacturing specifications or protocols, testing specifications or
             protocols, technical manuals, product manuals, service manuals, operation
20           manuals, samples, presentations, data files, meeting minutes, diaries,
             calendars, publications, product specifications, product development
21           documents, theory of operation documents, failure modes and effects
             documents, and any other design and technical documents.

22

23   Swinton Decl. 2 ¶ 8.

24        Based on this conflicting information, and the lack of an independent expert opinion that might

25   help define the scope of the technology at issue, the court will not impose a more narrowly-tailored

26   version of the prosecution bar.

27        **4.    Ethical Wall.**

28        The parties acknowledge that Knobbe Martens prosecutes patents for a BD subsidiary,

14                                                        09cv2319 BEN (NLS)

1  HandyLab, Inc.  Neither Mr. Zelkind nor Mr. Anderson works on patent prosecutions for that client.

2  Anderson Decl. 2 ¶ 10.  Knobbe Martens plans to implement an ethical wall in the firm before receiving

3  any Gen-Probe "Highly Confidential" documents in this case by restricting access to those documents

4  only to people staffed on the case.  *Id.*  Any person staffed on the case will first be vetted to confirm that

5  he or she does not work on patent prosecution for any patent applications owned by HandyLab.  *Id.*

6  Any person staffed on this case will be excluded from helping prosecute HandyLab patent applications.

7  *Id.*

8      Knobbe Martens also prosecutes patents for another BD subsidiary, GeneOhm Technology.  Mr.

9  Anderson used to prosecute patents for them but is no longer responsible for that patent prosecution.

10  Anderson Decl. 2 ¶ 8.  He does, however, occasionally help the prosecuting attorneys because of his

11  familiarity with the technology and experience prosecuting applications for these patent families.

12  Anderson Decl. 2 ¶ 8.  While these patents can be considered to be within the area of molecular

13  diagnostics, he says they do not relate to the subject matter of the patents asserted here because they do

14  not cite to the Gen-Probe patents at issue as prior art.  Anderson Decl. 2 ¶ 9.  If, upon further

15  investigation, these patents are found to relate to the patents at issue, Knobbe Martens shall also

16  implement an ethical wall between the GeneOhm patent prosecutors and the attorneys assigned to this

17  case.

18  **Conclusion and Order.**

19      The court finds that Gen-Probe has presented good cause for a legitimate concern that its

20  "Highly Confidential" information will be put at risk of inadvertent disclosure to potential competitors

21  in the field of molecular diagnostics.  Because Gen-Probe does not have an attorney-client relationship

22  with the Foley Hoag or Knobbe Martens firms, it cannot benefit from the same protections and conflict

23  checking mechanisms those clients receive, and consequently it cannot provide informed consent to

24  disclosure of its confidential information.  While Gen-Probe has not shown that the collective group of

25  patent prosecutors at Foley Hoag and Knobbe Martens working for unidentified clients in unknown

26  areas of patent prosecution are competitive decision makers, it did not have the tools to make such a

27  showing because Foley Hoag and Knobbe Martens understandably declined to provide that information

28  to Gen-Probe.

1    On the other hand, the Foley Hoag and Knobbe Martens firms would suffer prejudice if the court

2  ordered them to disclose their client lists and patent prosecutions to Gen-Probe so that Gen-Probe could

3  make a factual record to support its argument to impose the patent prosecution bar.  Also, if the court

4  imposed the prosecution bar, BD would be prejudiced in its ability to litigate this case with its chosen

5  counsel.  BD would also suffer from the downflow of prejudice that would be imposed on the Foley

6  Hoag and Knobbe Martens firms, as the careers of their attorneys, areas of expertise and client

7  relationships could be adversely impacted by imposition of the bar.

8    Recognizing the potential prejudice to both sides, this court attempts to strike the appropriate

9  balance by imposing the following requirement:

10    To provide further assurances to Gen-Probe that its "Highly Confidential" information is not

11  being freely passed around to all patent prosecutors at Foley Hoag and Knobbe Martens, and to provide

12  a record to Gen-Probe about who is reviewing its "Highly Confidential" information, and at the same

13  time not unduly burden BD's counsel with staffing predictions or unworkable constraints, any attorney

14  or non-attorney technical specialist who works for outside counsel and engages in patent prosecution or

15  materially assists in patent prosecution, and who has not yet been disclosed in any of the papers filed in

16  relation to this joint motion, shall execute a declaration before receiving any of the opposing party's

17  "Highly Confidential" documents in this case.  The declaration shall give a brief background of the

18  individual's general role and experience in patent prosecution, and shall detail whether that person is

19  actively involved in, or materially assisting others who are actively involved in, prosecuting patent

20  applications that relate to the subject matter of the patents-in-suit or disclose as prior art the patents-in-

21  suit.  The declaration shall be served on the opposing party before disclosure of any "Highly

22  Confidential" information.  The parties shall follow the same procedure for objecting to the receipt of

23  information by the proposed patent prosecutor as is already established for objecting to receipt of the

24  information by an independent expert.  If the parties do not agree on disclosure to the proposed patent

25  prosecutor, the objecting party shall move the court for a ruling within seven days of the objection.  The

26  objecting party may seek imposition of a prosecution bar as to the declarant.

27    While the court is aware that attorneys at these firms are already bound by state and likely firm-

28  wide ethical obligations, requiring the execution of the declaration will emphasize the importance to the

1  viewer to segregate Gen-Probe's confidential information from other clients of the firms who may

2  compete in the same technology area.  It will also provide Gen-Probe with important information needed

3  to evaluate whether it thinks the attorney should be subject to a prosecution bar.  This arrangement is not

4  meant to cast suspicion on an individual lawyer or technical specialist at Foley Hoag or Knobbe

5  Martens, but rather is a way for Gen-Probe to keep track of which patent prosecutors are reviewing its

6  confidential information, just as BD would be entitled to such information if Gen-Probe discloses BD's

7  "Highly Confidential" information to outside patent prosecutors or technical consultants.

8       The parties shall make the appropriate revisions to the proposed protective order reflecting this

9  requirement.  The parties shall lodge that revised protective order with Judge Stormes by **May 5, 2010**.

10      **IT IS SO ORDERED.**

11  DATED:  April 28, 2010

12

13  Hon. Nita L. Stormes
    U.S. Magistrate Judge
14  United States District Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28