UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEN-PROBE INCORPORATED, a Delaware corporation,<br><br>Plaintiff,<br>v.<br><br>BECTON, DICKINSON AND COMPANY, a New Jersey corporation,<br><br>Defendant. | Civil No. 09cv2319 BEN (NLS)<br>Civil No. 10cv0602 BEN (NLS)<br><br>**ORDER RESOLVING JOINT MOTION FOR DETERMINATION OF DISCOVERY DISPUTE NO. 15**<br><br>[Doc. No. 254] |
| BECTON, DICKINSON AND COMPANY, a New Jersey corporation,<br><br>Counterclaimant,<br>v.<br><br>GEN-PROBE INCORPORATED, a Delaware corporation,<br><br>Counterdefendant. | |

Plaintiff Gen-Probe Incorporated ("Gen-Probe") and Defendant Becton, Dickinson and Company ("BD") submitted a joint motion to resolve a discovery dispute as to whether the attorney-client privilege applies to communications between Gen-Probe's outside patent prosecution counsel and a third party, Mark Toukan. [Doc. No. 254.] The subject communications are identified in Gen-Probe's privilege logs of January 14, 2011 and December 19, 2011. For the following reasons, the court finds that the subject communications are protected by the attorney-client privilege.

**I. Relevant Background**

In 1996, Gen-Probe Inc. ("Gen-Probe") contracted with RELA, Inc. ("RELA") to help Gen-Probe develop an automated nucleic acid detection system. (Cappellari Decl. ¶ 2; Kling Decl. ¶ 1.) Gen-Probe required RELA to maintain the confidentiality of its work product, and to acquire all intellectual property rights from its employees and contractors and assign these rights to Gen-Probe. (Cappellari Decl. ¶¶ 2-3, Ex. A.) RELA hired Mark Toukan as an independent contractor to work on this project, ("Project Ginny"). (Kling Decl. ¶ 3; Cappellari Decl. ¶ 7, Exs. B-F.) While Mr. Toukan's contract with RELA cannot be found, RELA did not assign anyone to Project Ginny unless he or she first signed a standard form contractor agreement. (Kling Decl. ¶ 2.) This agreement provided, in pertinent part:

> 3. All properties resulting from this agreement, whether tangible or intellectual, including, but not limited to, trade secrets and inventions, copyrights, etc., whether or not patentable, are hereby assigned to RELA. The contractor agrees to sign any documents, (e.g., patent applications) which RELA may deem necessary to transfer ownership of said property, regardless of whether or not this agreement has been terminated.
>
> ...
>
> 6. It is understood that under this agreement and while working for RELA, the contractor may be given access to, or knowledge of, confidential information and trade secrets of RELA, its divisions and its clients. Such information may include, but is not limited to, hardware, software, technology, patents, concepts, ideas, discoveries, marketing strategies, purchasing policies, pricing and terms. Regardless of whether this agreement is still in force or has been terminated, and except as required by contractor's assigned duties, the contractor WILL NEVER directly or indirectly use, sell, discuss, disclose, convey, disseminate, lecture or publish articles or data relating to confidential information pertaining to RELA, its divisions, or its clients.

(Smith Decl. ¶¶ 3-4; Kling Decl. ¶ 4.)

In 2002, one of Gen-Probe's outside patent attorneys, Richard Wydeven, contacted Mr. Toukan by email and phone regarding a patentability investigation he was conducting. (Wydeven Decl. ¶ 6.) None of their communications related to any of the Automation Patents asserted by Gen-Probe in this case.[1] (Wydeven Decl. ¶ 8.) Becton, Dickinson & Co. ("BD") seeks to discover the contents of the discussions between Mr. Wydeven and Mr. Toukan.

---

[1] Although Gen-Probe makes a passing remark that the identified documents are not related to the patents that are the subject of this suit, as neither party has briefed the issue of relevance, the court assumes for the purpose of determining this joint motion that the documents are relevant. *See also Joint Mot.* at 20, n.17.

## II. Relevant Legal Principles

The attorney-client privilege protects disclosure of communications between a client and his attorney. *United States v. Zolin*, 491 U.S. 554, 562 (1989); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Whether the attorney-client privilege applies should be determined on a case-by-case basis. *See Upjohn Co.*, 449 U.S. at 396. The privilege "exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390. "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Weil v. Inv./ Indicators, Research & Mgmt., Inc.* 647 F.2d 18, 24 (9th Cir. 1981). The party asserting attorney-client privilege has the burden of establishing all of the elements of the privilege. *See United States v. Plache*, 913 F.2d 1375, 1379 n.1 (9th Cir. 1990).

An eight-part test determines whether information is covered by the attorney-client privilege:

> (1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal advisor (8) unless the protection be waived.

*United States v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002).

When, as here, a corporation is a party, a corporation privilege may apply. *See Upjohn Co.*, 449 U.S. 390-94. In *Upjohn*, the Supreme Court held that a corporation's privilege extends to communications between corporate employees and corporate counsel as long as the communications are "made at the direction of corporate superiors in order to secure legal advice." *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (citing *Upjohn*, 449 U.S. at 390-94). Additionally, "communications between employees of a subsidiary corporation and counsel for the parent corporation . . . would be privileged if the employee possesses information critical to the representation of the parent company and the communications concern matters within the scope of employment." *Admiral Ins. Co. v. U.S. Dist. Court for Dist. Of Az.*, 881 F.2d 1486, 1493 n.6 (9th Cir. 1989).

In *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), the Eighth Circuit extended privilege to communications between an independent contractor for a real estate partnership and the partnership's counsel. The contractor had interacted on a daily basis with the partnership's principals and was involved

in the transaction that gave rise to the suit. *Id.* at 938. The court held that "an independent consultant can be a representative of the client for the purpose of applying the attorney-client privilege." *Id.* at 936. The court considered it "inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors." *Id.* at 937. The court feared that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess just the very sort of information that the privilege envisions flowing most freely." *Id.* at 938. The court held that the attorney-client privilege applied to communications between counsel and the outside consultant because he was retained

> 'to provide advice and guidance regarding commercial and retail development based upon [his] knowledge of commercial and retail business in the State of Minnesota,' just as one would retain an outside accountant for her knowledge of, say, the proper accounting practices and taxation concerns of partnerships. There is no principled basis to distinguish [the Bieter consultant's] role from that of an employee, and his involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentially[.]

*Id.* The Ninth Circuit followed the Eighth Circuit's cue by adopting *Bieter's* principles in *United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010), holding an outside consultant's role in the company was that of a functional employee, thus implicating the corporate attorney-client privilege.

The corporation attorney-client principle applies to current and former corporate employees alike. *Admiral Ins. Co.*, 881 F.2d at 1493. Indeed, "[f]ormer employees, as well as current employees, may possess the relevant information needed by corporate counsel to advise the client with respect to actual or potential difficulties." *Id.* (citation omitted).

### III. Discussion

**A.  Was Mr. Toukan A Functional Equivalent Of A Gen-Probe Employee, Such That The Attorney-Client Privilege Attached To Conversations Between Him And Gen-Probe's Outside Counsel?**

BD asserts that Gen-Probe "does not enjoy attorney-client privilege over communications with Mr. Toukan as a former employee or consultant," (*Joint Mot.* at 9) as Mr. Toukan's relationship with RELA, a third-party, "does not create an attorney-client relationship between **Gen-Probe's** outside attorney counsel and Mr. Toukan." *Joint Mot.* at 8 (emphasis in original). In response, Gen-Probe argues that because Mr. Toukan was the functional equivalent of an employee of RELA, "he is treated

like an employee (or former employee) for privilege purposes." *Joint Mot*. at 16 n.15. After reviewing the applicable law, the court finds that the privilege should extend to cover communications with Mr. Toukan, as he was a functional employee of RELA, and there is no principled basis to treat him differently than true RELA employees who clearly fall within the confines of the attorney-client privilege.

Gen-Probe contracted with RELA in 1996 to help develop an automated nucleic acid detection system. (Cappellari Decl. ¶ 2; Kling Decl. ¶ 1.) Under *Bieter* and *Graf*, the attorney-client privilege extends to communications between independent contractors (here, RELA employees), and the corporation's (Gen-Probe) counsel. Thus, qualifying communications with true RELA employees working on Project Ginny would be covered by the attorney-client privilege.

RELA hired Mr. Toukan as an independent contractor to work on Project Ginny. Gen-Probe submitted evidence demonstrating that in signing a contract with RELA, Mr. Toukan submitted himself to a confidentiality provision that extended beyond his termination from the company. Further, the agreement included an assignment of any intellectual property rights stemming from his work. (Kling Decl. ¶¶ 2-3; Smith Decl. Ex. A.) RELA records show Mr. Toukan was a regular member of the Project Ginny team. (*See* Exs. B-D). On October 16, 1997, a RELA Memorandum titled "Ginny Roster" included Mr. Toukan as one of seven mechanical engineers working on the project. (Ex. C.) The nature of the work performed by RELA contract engineers on Project Ginny was equivalent to the type of work performed by actual RELA employees, and RELA employees and contract engineers were subject to similar levels of direction and supervision. (Kling Decl. ¶ 5.) Thus, the overall picture of Mr. Toukan's level of involvement with RELA displays that he functioned no differently than that of an actual RELA employee.

With this in mind, the court finds no plausible reason to not extend the reasoning employed in *Bieter* and *Graf* to the communications between Mr. Toukan and Gen-Probe's counsel. Mr. Toukan was a functional equivalent of a RELA employee, working in tandem with RELA employees on Project Ginny. To allow the privilege to extend to true RELA employees but not to Mr. Toukan is inconsistent with the reasoning set forth in *Bieter* and *Graf*. A contrary analysis would require Gen-Probe to first ask RELA which of its "employees" were true employees before undertaking communication with any

Project Ginny member. This situation leads to precisely the predicament faced in *Bieter*, where the court cautioned that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *In re Bieter Co.*, 16 F.3d at 938. Here, Mr. Toukan had information related to a patentability investigation performed by one of Gen-Probe's outside patent attorneys, Richard Wydeven. (Wydeven Decl. ¶¶ 6-7.) This information is precisely the type covered by the attorney-client privilege.

The court has considered the cases BD cites for the proposition that no attorney-client relationship existed between Mr. Toukan and Gen-Probe's outside counsel, and finds these cases unpersuasive. First, in *Sun Studs, Inc. v. Applied Theory Associates*, 772 F.2d 1557 (Fed. Cir. 1985), the Federal Circuit addressed the question of whether an attorney-client relationship existed between an inventor and his assignee's patent attorney, who prosecuted the patent application and for whom the inventor executed a power of attorney. Plaintiff Sun Studs hired Larry Hunter and his company, ATA, as consultants to develop a product. A written agreement was prepared where Sun Studs would become the sole owner of any resulting patents and ATA would receive 50% of any royalties. Pursuant to the agreement, a patent was eventually sought. The attorney for Sun Studs, Chernoff, represented both Sun Studs and the consultant-inventors, Hunter and ATA, on the patent application. Powers of attorney were duly executed by the inventors.

Litigation eventually ensued between Sun Studs and ATA. Sun Studs retained Chernoff, who earlier had prosecuted the patent application. ATA moved to disqualify Chernoff based on conflict of interest. The district court disqualified Chernoff. The Federal Circuit reversed, finding that a power of attorney does not necessarily create an attorney-client relationship. *Id.* at 1568. The court concluded that the relationship between the defendants-inventors and Chernoff was technical at best and not sufficient to warrant his automatic disqualification. In reaching this conclusion, the court relied on the following: (1) no agreement between inventors and attorney regarding representation; (2) no fee from inventor to attorney; (3) no expectation of confidentiality between the two; (4) the attorney denied being asked to represent the inventors; (5) the inventors knew the attorney represented the company; and (6) the inventors had previously consulted with their own attorney. *Id.* at 1567.

As applied here, BD conflates the issue of whether an independent attorney-client relationship exists between counsel and outside consultants in their individual capacities with the separate issue of whether an attorney-client privilege attaches to communications between counsel and outside consultants as functional employees of the company. The corporate attorney-client privilege serves to allow counsel to communicate freely with the corporation's employees and functional employees regarding legal matters. To truly be analogous to *Sun Studs*, Mr. Toukan would need to be attempting to disqualify Gen-Probe's outside counsel, Richard Wydeven, on the grounds that Wydeven's communication with him formalized an attorney-client relationship with him. In sum, *Sun Studs* involves only the question of whether a sufficient conflict of interest existed to bar Attorney Chernoff from representing Sun Studs. Because Chernoff's true client was Sun Studs–not the inventors–the court determined that an attorney-client relationship sufficient to bar Chernoff from representing Sun Studs did not exist.

Second, in *In re Ducane Gas Grills, Inc.*, 320 B.R. 312 (Bankr. S.C. 200), the plaintiffs invented a specialty grill and assigned their interests in the grill to a company, Ducane, which then approached the law firm Nexsen Pruet about patenting the grill. *Id.* at 315. A Nexsen Pruet attorney spoke with plaintiffs to gather more information about the grill. *Id.* In its findings of fact, the court noted that plaintiffs did not receive an engagement letter or any bill from Nexsen Pruet, nor did they pay for Nexsen Pruet's services. *Id.* Instead, the court found that "Ducane specified and paid for Nexsen Pruet's services." *Id.* Later, when litigation arose between the plaintiffs and Ducane's successor-in-interest, Weber, the plaintiffs sought to prevent Nexsen Pruet from representing Weber. *Id.* at 323. To this end, the plaintiffs claimed that "their disclosures to Nexsen Pruet, while Nexsen Pruet pursued a patent application for the [grill] on behalf of Ducane, gave rise to the attorney-client privilege," with Nexsen Pruet jointly representing the plaintiffs and Ducane with regard to their common legal interest. *Id.* The court concluded that plaintiffs failed to establish that Nexsen Pruet represented plaintiffs at all, let alone jointly with Ducane. *Id.* Thus, the court denied plaintiffs' request for attorney disqualification because there was never any indication that Nexsen Pruet previously initiated an attorney-client relationship with the plaintiffs. This case does not stand for the proposition that third parties cannot have an attorney-client privilege with a corporation's counsel (an issue that was readily rejected by *Bieter* and *Graf*).

///

Finally, *Genentech, Inc. v. Trustees of Univ. of Penn.*, 2011 WL 5079531 (N.D. Cal. 2011) does not help BD's cause.[2] The *Genentech* court determined that the discussions at issue did not relate to "issues of patentability, prior art, or even the prosecution and enforcement potential of the licensed patent portfolios." *Id.* at *2. Because of this, the attorney-client privilege did not attach because the communications were not made "for the purpose of seeking or relating legal advice. . . ." *Id.* Further, though the disputed communications were made by a "lawyer," the lawyer was speaking in his role as CEO, not in his role of rendering legal advice. *Id.* at *3. Thus, on both of these grounds, the attorney-client privilege did not attach. As applied here, Gen-Probe's privilege log shows the discussions between Wydeven and Toukan related to "patent application" questions, and "patent matter[s]." *Joint Mot.* at 1-3. Further, Wydeven declared that he contacted Toukan to assist with his "assignment to investigate matters of patentability of various aspects of Project Ginny." (Wydeven Decl. ¶ 7.) Thus, the fundamental shortcomings of *Genentech* are simply not present here.

**B.     Did The Attorney-Client Privilege Between Wydeven and Toukan Terminate Before 2002?**

BD argues further that the communications between Wydeven and Toukan are not privileged because they took place in 2002-2003, several years after Toukan completed his time with RELA. *Joint Mot.* at 9-10. Gen-Probe responds by saying that "numerous Ninth Circuit cases have held that communications between counsel and former employees are privileged. . . ." *Joint Mot.* at 15. The court agrees with Gen-Probe. In *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Ariz.*, 881 F.2d 1486 (9th Cir. 1989), the Ninth Circuit confirmed an earlier ruling which found that the corporate attorney-client privilege "necessarily extended . . . to former corporate employees," because "[f]ormer employees, as well as current employees, may possess the relevant information needed by corporate counsel to advise the client with respect to actual or potential difficulties. *Id.* at 1361 (citation omitted). Thus, the privilege was still preserved at the time of the subject communications in 2002-2003.

///

---

[2] BD notes that in *Genentech* there was "no privilege over emails between corporation's patent attorney and third-party inventor, who was also employed as a consultant to corporation." *Joint Mot.* at 8. The court clarifies that there was no privilege because there were no confidential communications made for the purpose of seeking legal advice, and not because the corporation's representative was an outside consultant as opposed to an in-house employee.

**C.    Did Gen-Probe Waive Its Privilege By Disclosing To An Adverse Party?**

In the reply section BD argues that even if an attorney-client privilege existed between Mr. Toukan and Gen-Probe's counsel in 1996, it had terminated in 2002 after RELA and Gen-Probe, and Mr. Toukan and Gen-Probe, became adverse. *Joint Mot.* at 21. Gen-Probe did not address the issue. BD did not assert any legal argument on this issue until the reply.[3]

Gen-Probe asserts that Wydeven's communications with Toucan in 2002-2003 did not refer or relate to any of the Automation Patents at issue here. Wydeven Decl. ¶ 8. In contrast, BD contends that in their 2002 and 2003 communications, Gen-Probe attempted unsuccessfully to acquire Mr. Toukan's rights as an inventor of the Automation Patents. *Joint Mot.* at 21. From this, BD concludes the parties were adverse. *Id.* BD also (1) cites to a Gen-Probe threat to sue RELA's successor for work done on the TIGRIS instruments *(Joint Mot.* at 8); and (2) asserts that "***nowhere does Attorney Wydeven deny that Mr. Toukan refused to execute an assignment of his patent rights to Gen-Probe***, thus confirming that by 2002, the legal interests of Mr. Toukan and Gen-Probe were adverse" (*Joint Mot.* at 21) (emphasis in original).

The court has already determined that Toukan was a functional employee of Gen-Probe and therefore Wydeven's conversations with him were privileged. This is as it should be so the company can obtain information from its consultants "and then control the attorney-client privilege, waiving it when necessary to serve corporate interests." *United States v. Graf*, 610 F.3d, 1148, 1161 (9th Cir. 2010). The court finds BD has not sufficiently demonstrated waiver of the privilege here.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[3]While BD references the "adversarial nature of Gen-Probe's relationship with RELA at the time [of the communications]" on page 9 of the Joint Motion, BD did not present, in its opening section, any legal argument to show that the facts, as they assert them to be, result in a waiver of the privilege.

### IV. Conclusion

In sum, the court **FINDS** that an attorney-client privilege attached to communications between Gen-Probe's outside counsel and Mr. Toukan, and that this privilege has not been waived or otherwise terminated. Accordingly, the Court denies BD's request in the *Joint Motion*, so that BD cannot pierce the attorney-client privilege and access the communications between Attorney Wydeven and Mr. Toukan.

**IT IS SO ORDERED.**

DATED: April 6, 2012

Hon. Nita L. Stormes
U.S. Magistrate Judge